

NIGHT BOX
FILED

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**BROWARD DIVISION**

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

SOUND ADVICE, INC., a Florida corporation,   Case No. 0 - 6050

    Plaintiff,

v.

MONOGRAM CREDIT CARD BANK OF   **DEFENDANT'S NOTICE**
GEORGIA, a Georgia banking corporation,   **OF REMOVAL**

    Defendant.

_____/

        Defendant   MONOGRAM   CREDIT   CARD   BANK   OF   GEORGIA ("Monogram"), a Georgia banking corporation, through undersigned counsel, files this Notice of Removal pursuant to 28 U.S.C. §§ 1441 and 1446, and signed pursuant to Rule 11, Fed. R. Civ. P., and in support states:

    1.    On December 13, 1999, Plaintiff SOUND ADVICE, INC. ("Sound Advice"), a Florida corporation, filed a complaint, styled <u>Sound Advice, Inc., Plaintiff v. Monogram Credit Card Bank of Georgia, Defendant</u>, Case No. 99-020997 CACE 11, in the Civil Division of the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida. The summons and complaint were served on Defendant Monogram on December 16, 1999.

    2.    The multi-count complaint (a copy of which, together with all exhibits and process served upon the Defendant, is attached hereto as Exhibit "A") purports to allege a claim for breach of contract, breach of implied duty of good faith and fair dealing, unjust enrichment, equitable   accounting,   fraudulent   misrepresentation   and   inducement,   and   negligent misrepresentation and inducement, seeking compensatory damages.

3.      Sound Advice, according to its own allegations and upon defendant's information and belief, is a Florida corporation with its principal place of business in Broward County, Florida.

4.      Defendant Monogram is a Georgia banking corporation with its principal place of business in Atlanta, Georgia.

5.      The amount in controversy in the action exceeds $75,000, exclusive of interest, attorneys' fees and costs.

6.      Accordingly, this Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332.  Removal of this case to this Court is proper pursuant to the provisions of 28 U.S.C. § 1441 and is effectuated by the procedure set forth in 28 U.S.C. § 1446.

7.      Prior to this removal, plaintiff agreed to extend the time for defendant to answer or move, with respect to the complaint, through and including February 4, 2000.

WHEREFORE, Defendant requests that this action be removed from the 17th Judicial Circuit in and for Broward County, Florida, to the United States District Court for the Southern District of Florida.

Dated: January 10, 2000
       Miami, Florida

Bruce J. Berman (FBN 159280)
Gina A. Dombosch (FBN 087343)
**WEIL, GOTSHAL & MANGES LLP**
Attorneys for Defendant
701 Brickell Avenue, Suite 2100
Miami, FL 33131-2861
Telephone: (305) 577-3100
Facsimile: (305) 374-7159

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a copy of the foregoing was served by mail this 10th

day of January, 2000 on Alan D. Lash, Esq., Lash & Goldberg LLP, 100 S.E. Second Street,

Suite 1200, NationsBank Tower, Miami, FL  33131-2158.

Bruce J. Berman (FBN/159280)
Gina A. Dombosch (FBN 087343)
**WEIL, GOTSHAL & MANGES LLP**
Attorneys for Defendant
701 Brickell Avenue, Suite 2100
Miami, FL  33131-2861
Telephone:  (305) 577-3100
Facsimile:  (305) 374-7159

CACE

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT, IN AND FOR BROWARD
COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.

12-16-99   99020997

11:00am    17

SOUND ADVICE, INC., a
Florida corporation,

      Plaintiff,

v.

MONOGRAM CREDIT CARD BANK
OF GEORGIA, a Georgia banking
corporation,

      Defendant.

_____/

## CIVIL ACTION SUMMONS

THE STATE OF FLORIDA

TO EACH SHERIFF OF THE STATE:  You are commanded to serve this Summons and
a copy of the Complaint and accompanying documents on defendant:

      **Monogram Credit Card Bank of Georgia**
      **Registered Agent:  Walter W. Driver**
      **191 Peachtree Street**
      **Atlanta, GA 30303**

## IMPORTANT

    A lawsuit has been filed against you.  You have twenty calendar days after this
Summons is served on you to file a written response to the attached Complaint in this
Court.  A phone call will not protect you; your written response, including the above case
number and named parties, must be filed if you want the Court to hear your case.  If you
do not file your response on time, you may lose the case, and your wages, money and

Page 1 of 2

Exhibit A

property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the Court, located at:

**BROWARD COUNTY COURTHOUSE**
**201 SE SIXTH STREET**
**FT. LAUDERDALE, FL 33301**

you must also mail or take a carbon copy or photocopy of your written response to the "Plaintiff/Plaintiff's Attorney" named below.

ALAN D. LASH, ESQ.
LASH & GOLDBERG LLP
100 S.E. SECOND STREET
SUITE 1200, NATIONSBANK TOWER
MIAMI, FL 33131-2158
(305) 347-4040
(305) 347-4050 FAX

DEC 1 3 1999

DATED on _____, 19___.

(SEAL)

ROBERT E. LOCKWOOD

CLERK OF THE CIRCUIT COURT

By:_____
Deputy Clerk

DEBORAH A. LEWIS

A TRUE COPY
Circuit Court Seal

**Page 2 of 2**

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT, IN AND FOR BROWARD
COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.    99020997

SOUND ADVICE, INC., a
Florida corporation,

    Plaintiff,

v.

MONOGRAM CREDIT CARD BANK
OF GEORGIA, a Georgia banking
corporation,

    Defendant.

_____/

A TRUE COPY
ROBERT E. LOCKWOOD
DEC 13 1999

## COMPLAINT

Plaintiff, Sound Advice, Inc., sues defendant, Monogram Credit Card Bank of
Georgia, as alleged hereinbelow.

## NATURE OF THE ACTION

1.    This is an action for breach of contract, breach of implied obligation of good
faith and fair dealing, unjust enrichment, fraudulent and negligent misrepresentation and
inducement, an accounting and other legal and equitable relief.  The action arises out of
the wrongful conduct of Monogram Credit Card Bank of Georgia in connection with a
Credit Card Program Agreement entered into by and between Monogram and Sound
Advice.

## JURISDICTION AND VENUE

2.    This is an action for damages that exceed Fifteen Thousand Dollars

($15,000.00), exclusive of interest, costs and attorneys' fees. Accordingly, this Court has subject matter jurisdiction over this action pursuant to Section 26.012, Florida Statutes.

3.    Venue is proper in Broward County, Florida because Sound Advice has its principal place of business in Broward County; the transactions and events which are the subject matter of this action occurred in substantial part in Broward County; the defendant transacts a substantial amount of business in Broward County, Florida; the tortious conduct described hereinbelow occurred in Broward County; and the ends of justice otherwise require the parties to appear before the Court in Broward County, Florida. Accordingly, venue is appropriate in Broward County, Florida pursuant to Section 47.011, Florida Statutes.

## PARTIES

4.    Plaintiff, Sound Advice, Inc. ("Sound Advice"), is a Florida corporation with its principal place of business in Dania, Broward County, Florida. Sound Advice is a publicly-held, regional consumer electronics retail chain specializing in high-end audio and video equipment, accessories and service. Sound Advice was founded in Florida in 1974 and currently operates more than twenty retail stores in the Miami-Dade, Broward and Palm Beach county areas as well as in other highly populated areas of Florida.

5.    Defendant, Monogram Credit Card Bank of Georgia ("Monogram"), is a Georgia banking corporation with its principal place of business in Atlanta, Georgia. At all times material hereto, Monogram has transacted a substantial amount of business in Broward County, Florida. Upon information and belief, Monogram is owned in whole or in part by, or otherwise affiliated with, General Electric Credit Corporation ("GECC").

2

Monogram is sometimes referred to herein as, "GECC."

## GENERAL ALLEGATIONS

### A.  THE 1992 CREDIT CARD AGREEMENT

6.      In order to enhance its stature in the market as a unique provider of high-end

audio, video and mobile consumer electronics components, and to distinguish itself from

other consumer electronics retailers, Sound Advice sought to develop its own "private

label" credit card program.  Sound Advice and GECC eventually commenced negotiations

to develop a credit card program whereby GECC would provide certain financing to

qualified customers of Sound Advice.

7.      On August 12, 1992, Sound Advice and GECC entered into a "Credit Card

Program Agreement" (the "Agreement").  A true and correct copy of the Agreement (without

exhibits) is attached hereto and incorporated herein as Exhibit A.

#### 1.  The Credit Approval Process

8.      Among other things, the Agreement provides that GECC would make

financing available to qualified customers of Sound Advice for purchases of merchandise

or services at Sound Advice stores.  The program contemplates that for each qualified

credit card applicant, GECC would open an account for the customer, issue a credit card

to the customer, and extend credit to the customer for the purchase of merchandise or

services at the stores.

9.      Pursuant to Section 2.01 of the Agreement, the standards for qualifying for

the extension of credit and the issuance of a credit card pursuant to the credit card

program are established and applied to applicants unilaterally by GECC.

3

10.     Section 3.02 of the Agreement further provides that GECC, in its sole discretion, will determine the creditworthiness of all applicants for the credit card under the credit card program. The Agreement further allows GECC to periodically review the creditworthiness of cardholders in order to determine the range of credit limits to be made available or whether to suspend or terminate credit privileges of any cardholder.

11.     Moreover, in Section 3.05 of the Agreement, GECC agreed, in its sole discretion, to establish the credit criteria to be used in evaluating applicants in connection with the program. In short, GECC was solely and exclusively responsible for approving applicants, determining whether to extend credit and, if so, to what extent, and monitoring the creditworthiness of cardholders.

12.     Once GECC approved a cardholder, the terms and conditions upon which a cardholder would be able to thereafter use the credit card would be subject to a credit card agreement between the cardholder and GECC.

### 2.   The Promotion of the Program

13.     In connection with the establishment of the credit card program, Sound Advice and GECC agreed to extensively promote the program. Among other things, Sound Advice agreed to include credit card applications in its catalogues, make credit card applications available in the stores, and provide point-of-sale credit card solicitation displays.

14.     In turn, GECC agreed to reimburse Sound Advice for expenses it incurred in connection with the promotion of the credit card program up to certain specified amounts in accordance with Article II of the Agreement.

4

15. In Section 2.06 of the Agreement, the parties agreed to cooperate with each other in connection with the establishment and operation of the program and the promotion of the program.

16. In addition, the parties periodically conducted sales promotions whereby GECC would provide financing for purchases made by qualified customers of Sound Advice during certain interest-free sales promotions. Initially, the Agreement contemplated sales promotions involving a "ninety (90) days same as cash" repayment option feature on initial purchases. Subsequently, the parties initiated programs whereby customers would be afforded a "six month, no interest" or "twelve month, no interest" repayment option feature. Pursuant to the terms of these promotions, the financing of a purchase would be interest free if the customer paid the original amount of the purchase price in full during the promotional period.

### 3. The Financial Relationship Between Sound Advice and GECC

17. Article VII of the Agreement sets forth the financial arrangements as between Sound Advice and GECC with regard to the transactions which are the subject matter of the Agreement. Section 7.01, titled "Settlement," details the method and manner by which GECC would extend credit to qualified customers of Sound Advice and account to Sound Advice for the charges associated therewith.

18. Among other things, Section 7.02 of the Agreement, titled "Discount Fee," contemplates that in exchange for the extension of credit to qualified customers of Sound Advice, GECC would be paid a discount fee. With respect to interest free sales promotions, the Agreement contemplates that the discount fee would be calculated based

5

on several financing factors such as the pay-off or payout rates and money cost charges.

19.    The original term of the Agreement was for a five (5) year period, and the Agreement contemplates automatic successive five (5) year renewals unless otherwise terminated. The Agreement further provides both parties with the unilateral right to terminate the Agreement without cause after notice.

## B.  THE 1996 AMENDMENT

20.    Prior to the expiration of the term of the Agreement, the parties entered into an Amendment dated as of June 14, 1996 (the "Amendment"). A true and correct copy of the Amendment is attached hereto and incorporated herein as Exhibit B.

21.    Among other things, the Amendment extended the initial term of the Agreement for an additional two-year period, changed the provisions of Section 3.04 of the Agreement and renamed "discount fee" to "service fee," and eliminated Sound Advice's ability to unilaterally terminate the Agreement without cause.

22.    In addition, the Amendment granted GECC the right to unilaterally change the fee schedule during the term of the Agreement. However, any change GECC made to the "service fee" had to be made in good faith and on commercially reasonable terms.

## C.  GECC'S WRONGFUL CONDUCT

23.    Subsequent to the Amendment, Sound Advice discovered that GECC had materially breached the Agreement and the Amendment, and its duty of good faith and fair dealing thereunder, and had made certain misrepresentations of material fact in order to induce Sound Advice to enter into the Amendment, as follows:

(i)    In negotiations prior to the Amendment, and in order to induce Sound

6

Advice to enter into the Amendment, GECC, by and through its duly authorized representative, Dan Liston, specifically represented that it would continue to reimburse Sound Advice for promotional expenses during each year of the seven-year term of the Agreement, as amended, up to $100,000.00 per year. Notwithstanding these representations, and in violation of the express and implied terms and conditions, as well as the spirit and intent, of the Agreement and Amendment, GECC failed and refused to reimburse Sound Advice up to $100,000.00 in each of the last two (2) years of the term of the Agreement, as amended.

(ii)    Sound Advice discovered that, in violation of the express and implied terms and conditions, as well as the spirit and intent, of the Agreement and Amendment, GECC had retained the "discount fees" or "service fees" charged to Sound Advice in situations where merchandise purchased during a promotional period had been returned. Despite demand, GECC has failed and refused to return or refund to Sound Advice the improperly retained "discount fees" or "service fees."

(iii)    GECC made unilateral, substantial and inappropriate increases to the fees charged to Sound Advice under the Agreement and the Amendment in bad faith, and in violation of the express and implied terms and conditions, as well as the spirit and intent, of the Agreement and Amendment.

(iv)    GECC failed to cooperate in good faith with Sound Advice in connection with a pre-approved credit promotion, resulting in approximately $50,000.00 in out-of-pocket losses to Sound Advice, as well as injury and damage to its business reputation and goodwill with its customers.

7

24.    As a direct and proximate result of the foregoing conduct, Sound Advice has suffered damages, and has retained the law firm of Lash & Goldberg LLP and is obligated to pay it a reasonable fee for its services.

25.    All conditions precedent to the institution and maintenance of this action, including notice and demand, have occurred, been performed, or otherwise have been waived.

## COUNT I

## BREACH OF CONTRACT

26.    Sound Advice incorporates by reference the factual allegations set forth in paragraphs 1 through 25, above, as if fully set forth herein.

27.    GECC has materially breached the Agreement and the Amendment by: (i) failing and refusing to refund or return to Sound Advice the "discount fees" or "service fees" charged and deducted by GECC on credit-based sales promotions with respect to returned merchandise; (ii) failing and refusing to reimburse Sound Advice up to $100,000.00 in each of the last two (2) years of the term of the Agreement as amended; (iii) failing and refusing to cooperate with Sound Advice in connection with the establishment and operation of the program and the promotion of the program; and (iv) making unilateral, substantial and inappropriate increases to the fees charged to Sound Advice under the Agreement and the Amendment in bad faith, and in violation of the express and implied terms and conditions, as well as the spirit and intent, of the Agreement and Amendment.

8

28.    As a result of GECC's material breaches of the Agreement, Sound Advice has been damaged.

WHEREFORE, Sound Advice demands judgment against GECC for compensatory damages, prejudgment and postjudgment interest, costs, attorneys' fees pursuant to Section 57.105, Florida Statutes, and such other relief as this Court deems just and proper.

## COUNT II

## BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

29.    Sound Advice incorporates by reference the factual allegations set forth in paragraphs 1 through 25, above, as if fully set forth herein.

30.    GECC had an implied duty and obligation of good faith and fair dealing under the Agreement and the Amendment.

31.    GECC breached its implied duty and obligation of good faith and fair dealing under the Agreement and the Amendment by: (i) failing and refusing to refund or return to Sound Advice the "discount fees" or "service fees" charged and deducted by GECC on credit-based sales promotions with respect to returned merchandise; (ii) failing and refusing to reimburse Sound Advice up to $100,000.00 in each of the last two (2) years of the term of the Agreement as amended; (iii) failing and refusing to cooperate with Sound Advice in connection with the establishment and operation of the program and the promotion of the program; and (iv) making unilateral, substantial and inappropriate increases to the fees charged to Sound Advice under the Agreement and the Amendment

9

in bad faith, and in violation of the express and implied terms and conditions, as well as the spirit and intent, of the Agreement and Amendment.

32.    As a direct and proximate result of the breach of the implied duty of good faith and fair dealing by GECC, Sound Advice has suffered damages.

WHEREFORE, Sound Advice demands judgment against GECC for compensatory damages, prejudgment and postjudgment interest, costs, attorneys' fees pursuant to Section 57.105, Florida Statutes, and such other relief as this Court deems just and proper.

## COUNT III

## UNJUST ENRICHMENT

33.    Sound Advice incorporates by reference the factual allegations set forth in paragraphs 1 through 25, above, as if fully set forth herein.

34.    Alternatively, GECC has been unjustly enriched based upon the conduct alleged hereinabove.

35.    GECC has knowingly and voluntarily received, accepted, and retained a benefit from Sound Advice without payment or provision of services therefor under circumstances which violate good conscience and fundamental equitable principles.

36.    Accordingly, GECC has been unjustly enriched at the expense and to the detriment of Sound Advice.

WHEREFORE, Sound Advice demands judgment against GECC for compensatory damages, prejudgment and postjudgment interest, costs, attorneys' fees pursuant to Section 57.105, Florida Statutes, and such other relief as this Court deems just and proper.

10

## COUNT IV

## EQUITABLE ACCOUNTING

37.    Sound Advice incorporates by reference the factual allegations set forth in paragraphs 1 through 25, above, as if fully set forth herein.

38.    The accounts by and between Sound Advice and GECC with respect to transactions involving returned merchandise, and the "discount fees" or "service fees" charged by GECC in connection therewith, are intricate and complex.

39.    By virtue of the intricacy and complexity of the accounts, the special relationship between Sound Advice and GECC under the Agreement and the Amendment, and with respect to the accounts, and the fact that all relevant and material documentation and information regarding the accounts is in the sole and exclusive possession of GECC, an equitable accounting is necessary and warranted to fully and accurately determine the total amount of the monies due Sound Advice.

40.    Accordingly, Sound Advice respectfully requests that the Court order GECC to account for all "discount fees" or "service fees" improperly retained in connection with returned merchandise.

WHEREFORE, Sound Advice demands an equitable accounting from GECC with respect to the accounts and transactions described hereinabove, interest on all amounts determined by such accounting to be due and owing to Sound Advice, costs, and such other relief as the Court deems just and proper.

11

## COUNT V

## FRAUDULENT MISREPRESENTATION AND INDUCEMENT

41.    Sound Advice incorporates by reference the factual allegations set forth in paragraphs 1 through 25, above, as if fully set forth herein.

42.    In order to induce Sound Advice to enter into the Amendment, GECC made misrepresentations of material fact as alleged hereinabove.

43.    Specifically, GECC represented that it would continue to reimburse Sound Advice for promotional expenses during each year of the seven-year term of the Agreement, as amended, up to $100,000.00 per year.

44.    This representation was false when made.

45.    GECC's representation was a material inducement to Sound Advice to enter into the Amendment and agree to the amended fee structure set forth therein.

46.    GECC made the misrepresentation with the specific intent that Sound Advice rely thereon in entering into the Amendment and agreeing to the amended fee structure set forth therein.

47.    GECC's conduct was willful, wanton and committed with reckless disregard for the rights of Sound Advice.

48.    Sound Advice justifiably and reasonably relied to its detriment on GECC's misrepresentation in entering into the Amendment and agreeing to the amended fee structure set forth therein.

49.    As a direct and proximate result of its justified and detrimental reliance on GECC's misrepresentation, Sound Advice has suffered damages separate and apart from

12

the damages suffered as a result of GECC's breaches of the Agreement and the Amendment.

WHEREFORE, Sound Advice demands judgment against GECC for compensatory damages, prejudgment and postjudgment interest, costs, attorneys' fees pursuant to Section 57.105, Florida Statutes, and such other relief as this Court deems just and proper.

## COUNT VI

## NEGLIGENT MISREPRESENTATION AND INDUCEMENT

50.    Sound Advice incorporates by reference the factual allegations set forth in paragraphs 1 through 25, above, as if fully set forth herein.

51.    In order to induce Sound Advice to enter into the Amendment, GECC made misrepresentations of material fact as alleged hereinabove.

52.    Specifically, GECC represented that it would continue to reimburse Sound Advice for promotional expenses during each year of the seven-year term of the Agreement, as amended, up to $100,000.00 per year.

53.    GECC had knowledge as to the truth or falsity of the representation, or made the representation under circumstances in which it ought to have known of its falsity.

54.    GECC's representation was a material inducement to Sound Advice to enter into the Amendment and agree to the amended fee structure set forth therein.

55.    GECC made the misrepresentation with the specific intent that Sound Advice rely thereon in entering into the Amendment and agreeing to the amended fee structure set forth therein.

13

56.     Sound Advice justifiably and reasonably relied to its detriment on GECC's misrepresentation in entering into the Amendment and agreeing to the amended fee structure set forth therein.

57.     As a direct and proximate result of its justified and detrimental reliance on GECC's misrepresentation, Sound Advice has suffered damages separate and apart from the damages suffered as a result of GECC's breaches of the Agreement.

WHEREFORE, Sound Advice demands judgment against GECC for compensatory damages, prejudgment and postjudgment interest, costs, attorneys' fees pursuant to Section 57.105, Florida Statutes, and such other relief as this Court deems just and proper.

## PUNITIVE DAMAGES

58.     Pursuant to Section 768.72, Florida Statutes, Sound Advice reserves the right to amend this complaint to seek punitive damages against GECC as a result of the tortious conduct described above.

14

## DEMAND FOR JURY TRIAL

59.    Pursuant to Rule 1.431, Florida Rules of Civil Procedure, Sound Advice requests a trial by jury as to all issues so triable as a matter of right.

Respectfully Submitted:

**LASH & GOLDBERG LLP**
Suite 1200, NationsBank Tower
100 SE 2nd Street
Miami, Florida 33131
(305) 347-4040
Attorneys for Sound Advice

By: _____
    **ALAN D. LASH**
    Florida Bar No. 510904
    **JESSICA L. LEYVA**
    Florida Bar No. 153559

**15**



ORIGINAL

CREDIT CARD PROGRAM AGREEMENT

BY AND BETWEEN

SOUND ADVICE, INC.

AND

MONOGRAM CREDIT CARD BANK OF GEORGIA

August _12_, 1992

TABLE OF CONTENTS

CREDIT CARD PROGRAM AGREEMENT

| | Page |
|---|---|
| ARTICLE I.   DEFINITIONS | 1 |
| Section 1.01   Generally | 1 |
| Section 1.02   Miscellaneous | 6 |
| | |
| ARTICLE II.   ESTABLISHMENT OF PROGRAM | 7 |
| Section 2.01   Establishment of Program, Generally | 7 |
| Section 2.02   Merchant to Honor Credit Card | 7 |
| Section 2.03   Promotion of Program | 7 |
| Section 2.04   Confidential Information | 8 |
| Section 2.05   Use of Marks | 9 |
| Section 2.06   Advertising Materials | 9 |
| Section 2.07   Cooperation | 9 |
| Section 2.08   Conditions Precedent to Agreement | 9 |
| Section 2.09   Bank One | 10 |
| | |
| ARTICLE III.   ADMINISTRATION OF PROGRAM | 11 |
| Section 3.01   Preparation of Documents | 11 |
| Section 3.02   Account Administration | 12 |
| Section 3.03   Ownership of Accounts | 13 |
| Section 3.04   Sales Promotions | 13 |
| Section 3.05   Credit Criteria | 13 |
| Section 3.06   Insurance and Other Value-Added Programs | 14 |
| Section 3.07   Retention of Documents | 16 |
| Section 3.08   In-Store Payments | 16 |
| Section 3.09   Inserts | 16 |
| Section 3.10   Administrative Support Functions | 16 |
| Section 3.11   Program Manager | 17 |
| Section 3.12   Postage | 17 |
| | |
| ARTICLE IV.   OPERATING PROCEDURES | 17 |
| Section 4.01   General | 17 |
| Section 4.02   Purchase Authorization Procedures | 17 |
| Section 4.03   Submission of Transaction Data | 18 |
| Section 4.04   Receipt of Materials; Program Compliance | 18 |
| | |
| ARTICLE V.   WARRANTIES AND COVENANTS | 18 |
| Section 5.01   Presentment Warranties of Merchant | 18 |
| Section 5.02   Account Covenants of Merchant | 20 |
| Section 5.03   General Representations and Warranties of Merchant | 20 |
| Section 5.04   Representations, Warranties and Covenants of Bank | 22 |

ARTICLE VI.    CHARGEBACK.....................................    23
    Section 6.01    Bank's Right to Charge Back............    23
    Section 6.02    Limitation of Chargeback...............    24
    Section 6.03    Exercise of Chargeback.................    24

ARTICLE VII.   SETTLEMENT; CHARGES.........................    24
    Section 7.01    Settlement.............................    24
    Section 7.02    Discount...............................    25
    Section 7.03    Volume Adjustment Fee..................    25

ARTICLE VIII.  EVENTS OF DEFAULT; RIGHT AND REMEDIES......    26
    Section 8.01    Events of Default......................    26
    Section 8.02    Bank Events of Default.................    26
    Section 8.03    Merchant Events of Default.............    27
    Section 8.04    Remedies...............................    28

ARTICLE IX.    TERM/TERMINATION............................    28
    Section 9.01    Term...................................    28
    Section 9.02    Grounds for Termination................    28
    Section 9.03    Rights and Duties Upon Termination.....    31
    Section 9.04    Effect of Termination..................    33

ARTICLE X.     INDEMNIFICATION.............................    34
    Section 10.01    Indemnification By Merchant...........    34
    Section 10.02    Indemnification By Bank...............    34
    Section 10.03    Defense of Claims.....................    35
    Section 10.04    Payment of Indemnified Amounts........    35

ARTICLE XI.    MISCELLANEOUS...............................    36
    Section 11.01    Power of Attorney.....................    36
    Section 11.02    Securitization/Participation..........    36
    Section 11.03    Assignment............................    36
    Section 11.04    Amendment.............................    36
    Section 11.05    Non-Waiver............................    36
    Section 11.06    Severability..........................    36
    Section 11.07    Governing Law.........................    37
    Section 11.08    Captions..............................    37
    Section 11.09    Notices...............................    37
    Section 11.10    Access................................    37
    Section 11.11    Further Assurances....................    38
    Section 11.12    Entire Agreement......................    38
    Section 11.13    Binding Effect........................    38
    Section 11.14    Counterparts..........................    38
    Section 11.15    Arrangements with Third Parties.......    38

ARTICLE XII.   OFFSET RIGHT; SECURITY INTEREST.............    39

    Section 12.01    Right of Offset.......................    39
    Section 12.02    Security Interest.....................    39

ARTICLE XIII.  FIXED FUNDING ELECTION......................    40

EXHIBITS

    Exhibit A -- Marks
    Exhibit B -- Manual of Operating Procedures

SCHEDULES

    Schedule  2.08(a) -- Form of Secretary's Certificate
    Schedule  2.08(b) -- Form of Bring-Down Certificate
    Schedule  2.08(c) -- Form of Opinion of Counsel
    Schedule  12.02   -- Schedule of Secured Creditors Who
                      Need to Execute Lien Subordination
                        Agreements

## CREDIT CARD PROGRAM AGREEMENT

THIS CREDIT CARD PROGRAM AGREEMENT ("Agreement"), made as of the _12th_ day of August, 1992, by and between MONOGRAM CREDIT CARD BANK OF GEORGIA, a Georgia banking corporation ("Bank"), with its principal place of business at 1000 Holcomb Woods Parkway, Roswell, Georgia 30076, and SOUND ADVICE, INC., a Florida corporation ("Merchant") with its principal place of business at 1901 Tigertail Boulevard, Dania, Florida 33004;

### W I T N E S S E T H:

WHEREAS, Bank has established programs to extend customized revolving credit to qualified customers for the purchase of goods and services from various merchants; and

WHEREAS, Merchant, through its "Sound Advice" stores, is engaged, among other activities, in the retail sale of consumer goods and services; and

WHEREAS, Merchant has requested that Bank offer a program to extend credit to qualified customers of its "Sound Advice" stores for the purchase of goods and services at such stores; and

WHEREAS, Bank has offered to extend such program to qualified customers of Merchant at such stores subject to certain terms, covenants and conditions which are contained hereinbelow, which Merchant has accepted;

NOW, THEREFORE, in consideration of the terms, covenants and conditions contained hereinbelow, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Bank and Merchant agree as follows:

### ARTICLE I

### DEFINITIONS

Section 1.01. Generally. The following words shall have the following meanings when used in this Agreement:

"Account" means each open-end credit account established by Bank under the Program, pursuant to which a Cardholder may finance, for personal, family or household purposes, the purchase of Goods and Services from Stores on credit subject to the terms of a Credit Card Agreement between the Cardholder and Bank and, in connection with the establishment of such open-end credit account under the Program, the following property, or interests in property: (i) any and all Account Documentation; (ii) all accounts, accounts receivable, Indebtedness, other receivables, contract

rights, choses in action, general intangibles, chattel paper, instruments, documents, and notes, and all proceeds of all of the foregoing, arising in connection with the purchase of Goods and Services pursuant to an Account, (iii) any and all rights and remedies as to stoppage-in-transit, reclamation, return and repossession of Goods and Services financed pursuant thereto; (iv) any and all goods or other property, contracts of indemnity, guaranties or sureties, proceeds of insurance and other proceeds at any time standing as security therefor; and (v) any and all other rights, remedies, benefits, interests and titles, both legal and equitable, to which Bank may now or at any time hereafter be entitled in respect of the foregoing. For all purposes hereof, the terms "accounts," "chattel paper," "instruments," "documents," "general intangibles" and "proceeds," as used in this definition, shall have the meanings given to such terms under the UCC as in effect on the Effective Date.

"Account Documentation" means, with respect to an Account, any and all documentation relating to such Account, including, without limitation, Credit Card Documentation, checks and stubs, credit bureau reports, adverse action notices, change of terms notices, correspondence, memoranda, documents, instruments, certificates, agreements, invoices, sales or shipping slips, delivery and other receipts, magnetic tapes, disks, hardcopy formats or other computer-readable data transmissions or software, any microfilm, electronic or other copy of any of the foregoing, and any other written, electronic or other records or materials of whatever form or nature, including, without limitation, tangible and intangible information, arising from or relating or pertaining to any of the foregoing.

"Active Account" means an Account with a credit or debit balance during a Billing Period.

"Agreement" means this Credit Card Program Agreement, including all amendments, modifications, supplements, exhibits, and schedules hereto, and shall refer to this Agreement as the same may be in effect at the time such reference is operative.

"Applicable Law" shall mean any and all local, state and federal laws, statutes, rules, regulations and authorities applicable to any a matter or matters described in this Agreement.

"Average Portfolio Balance", for any period, shall refer to the mean daily average of total Active Accounts (in dollars) within such period, as reasonably calculated by Bank on a consistent basis throughout the term of this Agreement.

"Bank" has the meaning set forth in the preamble to this Agreement.

"Billing Date(s)" means, individually or collectively, as the case may be, that date or series of dates during a calendar month as of which Accounts are billed, as designated by Bank from time to time.

"Billing Period" means the elapsed time between Billing Dates of Bank, as established by the Bank from time to time.

"Business Day" means any day except Saturday or Sunday, or a day on which banks are required or permitted to be closed in the State of Georgia.

"Cardholder" means any natural Person who has entered into a Credit Card Agreement with Bank or who is or who may become obligated under, with respect to, or on account of, an Account.

"Charge Slip" means a sales receipt, including, but not limited to, an invoice, sales slip, memorandum of purchase or similar document which evidences a purchase of Goods and Services from a Store that is to be charged to an Account and which evidences an amount to be advanced by Bank to Merchant on behalf of such Cardholder as provided in this Agreement.

"Charge Transaction Data" means such Account/Cardholder identification and transaction information with regard to each purchase of Goods and/or Services on credit, and each return, or exchange of goods or adjustment for services purchased with a Credit Card, as is from time to time required to be transmitted by a Store to Bank in accordance with the Operating Procedures.

"Credit Card" means the plastic card or temporary card issued under the Program exclusively for use with the Program, which card is owned by Bank and evidences a Cardholder's right to purchase Goods and Services under the Program.

"Credit Card Agreement" means each open-end credit agreement between Bank and a Cardholder governing the use of a Credit Card to access an Account, as the same may from time to time be amended, modified or supplemented.

"Credit Card Application" means Bank's credit application which must be completed by Persons who wish to become Cardholders and submitted to Bank for review.

"Credit Card Applicant" means each Person who applies for credit pursuant to a Credit Card Application.

"Credit Card Documentation" means, with respect to an Account, all Credit Card Applications, Credit Card Agreements, Credit Cards, Charge Slips, Credit Slips, and periodic billing statements relating to such Account.

"<u>Credit Slip</u>" means a sales credit receipt evidencing a re-turn or exchange of goods or a credit on an Account as an adjust-ment for Goods and Services purchased with a Credit Card.

"<u>Default</u>" shall mean any event or condition which with the giving of notice, the passage of time, or both, would constitute an "Event of Default".

"<u>Event of Default</u>" shall mean any event or condition identi-fied as such in Article VIII below.

"<u>GAAP</u>" means generally accepted accounting principles in the United States of America, as in effect from time to time, as set forth in the opinions and pronouncements of the Accounting Prin-ciples Board of the American Institute of Certified Public Ac-countants and the statements and pronouncements of the Financial Accounting Standards Board.

"<u>Goods and Services</u>" means all consumer goods and/or services of whatever type or kind, including, without limitation, warranty products or service, repair service and insurance programs, from time to time, sold at retail by Merchant to its customers for per-sonal, family or household use.

"<u>Indebtedness</u>" means any obligation incurred by a Cardholder in respect to an Account including, without limitation, any fi-nance charges, and any other charges in respect of an Account.

"<u>Initial Term</u>" has the meaning set forth in Section 9.01 be-low.

"<u>Insurance Programs</u>" shall mean group credit life, dis-ability, unemployment, property, liability and other insurance which may be offered by Bank (or vendors selected by Bank) to Cardholders.

"<u>Losses</u>" means, for purposes of this Agreement, any and all liabilities, costs, and expenses (including reasonable attorneys' fees and expenses), judgments, damages, claims, demands, offsets, defenses, counterclaims, actions, or proceedings by whomsoever asserted, including, but not limited to, (i) the Cardholders or other Persons responsible for the payment of Accounts, (ii) any Person or Persons who prosecute or defend any proceedings as rep-resentatives of or on behalf of a class or interest group, (iii) any governmental instrumentality, or (iv) any other third party, suffered or reasonably incurred by Bank or Merchant, as the case may be.

"<u>Marks</u>" means the name, logo, trademarks and service marks or similar proprietary designations claimed owned or used by Merchant as set forth on <u>Exhibit "A"</u> attached hereto.

"Maximum Investment" shall mean the maximum amount of credit which Bank is at any one time willing to extend to Cardholders under the Program and shall mean, initially, Thirty-Seven Million Five Hundred Thousand Dollars ($37,500,000) or such other amount as Bank, in its sole discretion, may at any time or from time to time specify to Merchant.

"Merchant" has the meaning set forth in the preamble to this Agreement.

"Net Accounts" shall have the meaning given to such term in Section 9.03(a) below.

"Operating Procedures" means the instructions and procedures to be followed by Merchant in each of its Stores in connection with the Program as set forth in Article IV of this Agreement and in the Manual of Operating Procedures attached hereto as Exhibit "B" or as otherwise may be established, modified or amended by Bank hereafter in the manner set forth in Section 4.01 below and subject to the provisions of Section 9.02(i) below.

"Person" means and includes any individual, partnership, joint venture, corporation, trust, unincorporated organization or government or any department or agency thereof.

"Prime Rate" shall mean the prime rate designated as such by The Wall Street Journal in its "Money Rates" Section on the last calendar day that such information is published in the calendar month preceding the monthly Billing Date, whether or not any such rate is actually ever charged or paid by any entity; provided however, that (i) should more than one such rate ever be designated, the higher (or highest) of such rates shall constitute the "Prime Rate" for purposes hereof; and (ii) should such designated rate become unavailable for any reason at any time or from time to time, Bank shall be permitted, in its sole discretion, to select a comparable such rate so long as such rate is not internally generated by Bank or any of its affiliates and is a publicly announced rate (or is based on a publicly announced rate).

"Program" means the credit card program established by this Agreement and made available to qualified customers of Merchant for the purchase of Goods and Services sold at Stores by Merchant. The term "Program" includes, particularly, but without limitation, the extension of credit to Cardholders, billing of Accounts, collection of Accounts, customer services rendered to Cardholders, accounting between the parties hereto, and all other aspects of the customized revolving credit plan contemplated hereby.

"Renewal Term" has the meaning set forth in Section 9.01 below.

"<u>Solvent</u>" means, with respect to any Person as of any particular date, that on such date (a) the present fair salable value of the assets of such Person is greater than the total amount of its liabilities, (b) such Person is presently able generally to realize upon its assets and pay its debts and other liabilities as they mature in the normal course of business, and (c) such Person is not engaged in and is not about to engage in business or a transaction for which such entity's property would constitute unreasonably small capital after giving due consideration to the prevailing practice in the industry in which such entity is engaged. The phrase "present fair salable value" of a Person's assets is intended to mean that value which can be obtained if the assets are sold within a reasonable time in arms-length transactions in an existing and not theoretical market.

"<u>Stores</u>" means, collectively, all "Sound Advice" retail stores, repair centers, warehouse centers, mail order centers and telephone and home solicitation sale centers, owned and operated at any time by Merchant within, and doing business in, the State of Florida with individual residents of the State of Florida (or any other State or States as Bank may approve in writing from time to time hereafter, with such approval not to be unreasonably withheld or delayed by the Bank).

"<u>UCC</u>" shall mean Article 9 - Secured Transactions of the Uniform Commercial Code of Georgia as in effect from time to time.

"<u>Value-Added Programs</u>" means any program offered through Bank under which Bank or a third party designated by Bank makes available value-added programs to Cardholders, as set forth in Section 3.06 below, including, particularly, but without limitation, Insurance Programs subject to the limitations set forth in said Section 3.06.

"<u>Volume</u>" shall mean, for any period, the total dollar amount of credit extended by Bank to Cardholders under the Program as evidenced by Charge Slips submitted by Merchant to Bank under the Program during such period, <u>less</u> the total dollar amount of debits to such extended credit as evidenced by Credit Slips submitted by Merchant to Bank during the same such period.

<u>Section 1.02</u>. <u>Miscellaneous</u>. As used herein, (i) all references to the plural number shall include the singular number (and vice versa), (ii) all references to the masculine gender shall include the feminine gender (and vice versa), and (iii) all references to "herein," "hereinbelow," "hereinabove" or like words shall refer to this Agreement as a whole and not to any particular section, subsection or clause contained in this Agreement. The terms "accounts," "chattel paper," "instruments," "documents," "general intangibles" and "proceeds," as used herein, shall have meanings given to such terms under the UCC as in effect on the Effective Date.

## ARTICLE II

### ESTABLISHMENT OF PROGRAM

**Section 2.01**.    **Establishment of Program Generally**.    Pursuant to the terms and conditions of this Agreement, Merchant and Bank hereby establish the Program, commencing on the Effective Date, or such later date as Merchant and Bank may agree, for the purpose of making open-end credit available (up to such credit limits as Bank may from time to time establish and modify) to qualified customers of Merchant for the purchase of Goods and Services from Merchant at the Stores.    With respect to each Credit Card Applicant under the Program who qualifies for credit under the standards unilaterally established by Bank from time to time, Bank will open an Account, issue to such Credit Card Applicant a Credit Card and grant credit to such qualified Credit Card Applicant for the purchase of Goods and Services from Merchant at the Stores.    The terms and conditions upon which a Cardholder may use the Credit Card, and upon which Bank may extend credit to a Cardholder, shall be governed by the Credit Card Agreement between the Cardholder and Bank.

**Section 2.02**.    **Merchant to Honor Credit Card**.    Merchant hereby agrees that it will participate in the Program and will honor any valid Credit Card issued by Bank for the purchase of Goods and Services at each Store.    Only the cash purchase price of Goods and Services sold or rendered by Merchant shall be charged to Accounts.    Sales and services to commercial enterprises shall not be charged to Accounts.    Merchant shall permit Cardholders with Accounts to charge Goods and Services to their Accounts, subject to and in accordance with the Operating Procedures.

**Section 2.03**.    **Promotion of Program**.    Merchant will promote the credit features of the Program to Cardholders, both existing and potential, in order to facilitate their maximum utilization. Merchant shall do this, among other ways, by including Credit Card Applications in all catalogues and by providing Stores with Credit Card Applications, point-of-sale credit solicitation displays and other promotional materials, and in any other manner to which Bank and Merchant may mutually agree from time to time.    To assist Merchant in its promotion of the credit features of the Program in this manner, Bank agrees as follows:

(a)    During the Initial Term, to reimburse Merchant for actual expenses incurred by Merchant in its promotion of the credit features of the Program in such manner during such year, within fifteen (15) days after Bank is presented with an invoice therefor from Merchant and such supporting data as Bank may reasonably request to evidence usage of funds expended for the purpose described hereinabove; if, but only if, in each instance, as of each such reimbursement date, (i) the Program is then in effect, (ii) neither Bank nor Merchant has received notice of termination from the other pursuant to Section 9.02 below, and (iii) no Event of

Default has occurred which is then continuing; and, <u>provided, further</u>, that the aggregate amount of all such promotional reimbursements made by Bank pursuant to this subsection (a) shall not exceed One Hundred Thousand Dollars ($100,000) per Program year and Five Hundred Thousand Dollars ($500,000) for the Initial Term.

(b) During the Initial Term and each Renewal Term (if any), to reimburse Merchant for actual expenses incurred by Merchant in its promotion of the credit features of the Program in such manner, to the extent that the Merchant has not been reimbursed therefor pursuant to subsection (a) above (which, during any Renewal Period, shall be equal to all such expenses), up to an amount, determined monthly in advance by Bank (for each succeeding calendar month), equal to the product of (A) the Average Portfolio Balance for the preceding calendar month <u>times</u> (B) .016%, if, but only if, in each instance, as of each such reimbursement date, (i) the Program is then in effect, (ii) neither Bank nor Merchant has received notice of termination from the other pursuant to Section 9.02 below, and (iii) no Event of Default has occurred which is then continuing; and, <u>provided, further</u>, that if the Prime Rate on any such reimbursement date is nine percent (9%) or more, no such supplemental reimbursement will be made by the Bank on such reimbursement date.

Section 2.04. <u>Confidential Information</u>. All material and information supplied by one party to the other party hereunder, or supplied to either party by Cardholders or Credit Card Applicants, including, but not limited to information concerning either party's marketing plans, objectives, financial results, customer or Cardholder names or addresses, is confidential and proprietary ("<u>Confidential Information</u>"). Confidential Information shall be used by each party solely in performance of its obligations pursuant to this Agreement. Each party shall receive Confidential Information in confidence and not disclose Confidential Information to any third party, except as may be necessary to perform its obligations pursuant to this Agreement or as otherwise is authorized or permitted under this Agreement, and except as may be agreed upon in writing by the other party, or as otherwise required by law or by rule or order of any governmental authority. Each party shall use its best efforts to ensure that its officers, employees, and agents take such action as shall be necessary or advisable to preserve and protect the confidentiality of Confidential Information. Except as otherwise provided in or necessary to comply with Article IX of this Agreement, upon written request or upon the termination of this Agreement, each party shall return to the other party or destroy all Confidential Information in its possession or control unnecessary to the conduct of its business. Confidential Information shall not include information in the public domain and information lawfully obtained from a third party. Notwithstanding and without limiting the generality of the foregoing, however, (i) Bank may obtain and furnish credit information and other information concerning creditworthiness with respect to any Credit Card Applicant or Cardholder from or to credit bureaus, credit interchanges and any others who may lawfully deliver and

-8-

receive such information for Bank's or their own use solely in determining the creditworthiness of any Credit Card Applicant or Cardholder; and (ii) as more fully described in Section 3.03 below, but subject to Section 9.03(a) below, Bank shall own and control the names, addresses and Charge Transaction Data concerning each Credit Card Applicant and Cardholder, and may retain all such data upon termination of this Agreement unless Merchant or its designee shall have purchased the Accounts pursuant to Section 9.03(a) in connection with such termination; provided, however, that, except as provided in Section 9.03(b) below, Bank shall not sell or use, or authorize any Person to sell or use, the names and addresses of any Credit Card Applicants or Cardholders unless Merchant has given its prior written consent thereto, such consent not to be unreasonably withheld or delayed by the Merchant.

Section 2.05. Use of Marks. Merchant hereby grants to Bank a nonexclusive license to use its Marks in connection with the Program, so long as such use shall be consistent with, and in connection with, the Bank's administration of the Program pursuant to terms and conditions hereof. Such license shall be irrevocable as long as this Agreement remains in effect and shall continue in effect after the expiration or any termination of this Agreement as provided in, and subject to the limitations contained in, Section 9.04(c) hereof. Merchant shall have the right to impose or prescribe any reasonable requirements with respect to the use of the Marks in connection with the Program in the foregoing manner. Merchant shall be responsible for the validity of any Marks used in connection with the Program.

Section 2.06. Advertising Materials. Merchant agrees that it will provide Bank with copies of any advertising or other media releases or promotional material regarding the Program developed by Merchant in its final form prior to publication for review and approval by Bank.

Section 2.07. Cooperation. Each party shall cooperate with and provide such assistance to the other as either party may reasonably request with respect to the establishment and operation of the Program, promotion of the Program, and the resolution of disputes, claims and other matters relating to transactions with Cardholders.

Section 2.08. Conditions Precedent to Agreement. This Agreement shall become effective between the parties, subject to the provisions of Section 2.09 below, upon such date (the "Effective Date"), as it shall have been duly executed by Merchant and Bank, provided that Bank shall have received on such date all of the documentation provided for in this Agreement, including, without limitation, the following:

(a)  <u>Board Resolutions</u>.  Resolutions of Merchant's Board of Directors, certified by the Secretary or Assistant Secretary of Merchant as of the date of this Agreement, in substantially the form attached as <u>Schedule 2.08(a)</u> hereto, to be duly adopted and in full force and effect on such date, authorizing (i) the execution, delivery, and performance of this Agreement and all documents executed or to be executed pursuant hereto, (ii) the granting of the liens herein provided for, and (iii) specific officers to execute and deliver this Agreement and all other related documents and instruments, together with an incumbency certificate from such secretary as to those officers of Merchant so authorized.

(b)  <u>Bring-down Certificate</u>.  A certificate signed by the chief executive or chief financial officer of Merchant in substantially the form attached as <u>Schedule 2.08(b)</u> hereto, stating in his capacity as such officer, to his knowledge, after investigation, that: (i) all of the representations and warranties of Merchant contained in this Agreement shall be correct on and as of the date of this Agreement as though made on and as of such date and (ii) no event shall have occurred and be continuing, or would result from the parties' consummation of the transactions contemplated hereby, which constitutes a Default or an Event of Default.

(c)  <u>Opinion of Merchant's Counsel</u>.  A favorable opinion of counsel to Merchant in substantially the form attached as <u>Schedule 2.08(c)</u> hereto.

(d)  <u>Precautionary Financing Statements</u>.  Appropriate financing statements (form UCC-I or others) in form satisfactory to the Bank and its legal counsel, have been filed and are in effect.

(e)  <u>Bank One.</u>  Bank shall have received evidence satisfactory to it that Merchant has given notice of cancellation of the Merchant's existing program agreement with Bank One, Dayton, N.A. ("<u>Bank One</u>") as more particularly described in, and consistent with the provisions of, Section 2.09 below.

<u>Section 2.09</u>.  <u>Bank One</u>.  (a) <u>Termination of Agreement</u>.  As of the date of this Agreement, Merchant is party to an existing credit card receivables program agreement (the "<u>Bank One Agreement</u>") with Bank One.  This Agreement is being entered into by Bank with Merchant subject to the following mutual understandings between Bank and Merchant in regard to the Bank One Agreement:  (i) the Bank One Agreement does not prohibit Merchant from entering into this Agreement; (ii) the Bank One Agreement may be terminated by Merchant at any time upon the giving of ninety (90) days prior written notice; (iii) Merchant will give notice of termination of the Bank One Agreement immediately after Bank and Merchant have executed this Agreement; (iv) the Bank One Agreement will terminate not later than ninety (90) days after such notice of termination from Merchant is received by Bank One; (v) during the period from the Effective Date until the Bank One Agreement is terminated, Merchant and Bank will take all

appropriate actions, using their collective best efforts, acting in good faith, to establish the Program and make it operational and effective by, but not prior to, the termination date of the Bank One Agreement, but neither will be obliged to undertake any actions described herein which are prohibited by the Bank One Agreement prior to its termination; (vi) if the Bank One Agreement is not terminated within ninety (90) days after notice of termination is received from Merchant by Bank One, either Bank or Merchant may terminate this Agreement on such ninetieth (90th) day (or as of any date after such ninetieth (90th) day so long as the Bank One Agreement has not been terminated by such date), subject to giving at least ten (10) days advance written notice to the other of its intent so to terminate and, upon such termination, neither party will have any further duty, obligation or liability to the other party, except for any which shall have accrued and be owing by one party to the other, as of the date of such termination; and (vii) Bank shall have the right to purchase, and shall use its best efforts to purchase, subject, however, to initiation and completion of its due diligence in regard thereto (based, in part, on statistical data concerning same heretofore supplied by Merchant to Bank) and its sole and complete satisfaction therewith, the investment of Bank One in all those credit card receivables covered by the Bank One Agreement and add them as Accounts under this Agreement, effective upon the termination of the Bank One Agreement, in the manner contemplated by, and in accordance with, Section 23 of the Bank One Agreement; but, failure to make such purchase by Bank, after using such best efforts, shall not constitute an Event of Default on the part of Bank under this Agreement.

(b)  No Duty on Bank's Part.  Notwithstanding anything to the contrary contained in this Agreement, Bank shall have no duty, obligation or liability to accept, process or review Credit Card Applications, approve Credit Card Applicants, open or purchase any Accounts, extend credit to any Cardholder on Account pursuant to a Credit Card or accept, or make remittances on, any Charge Transaction Data unless and until the Bank One Agreement is terminated.

## ARTICLE III

### ADMINISTRATION OF PROGRAM

Section 3.01.  Preparation of Documents.  Bank and Merchant shall cooperate and assist each other in the preparation of all Account Documentation to be used in connection with the Program; provided, however, that, as between Bank and Merchant, Bank will be solely responsible for, and obligated to insure that, the Account Documentation complies with Applicable Laws governing consumer credit.  Bank shall be responsible for the costs of printing and customization expenses associated with Credit Card Applications.  All Account Documentation shall clearly disclose that Bank is the creditor.  No Account Documentation shall be utilized by Merchant unless Bank has expressly approved its form and content. Merchant shall be responsible for insuring that all Stores use

-11-

only Account Documentation that has been approved by Bank. Bank shall be responsible for the costs of printing and distributing billing statements, collection notices, adverse action notices, other notices and communications required by Applicable Law and such other internal Account Documentation as may be required to administer the Program, if and to the extent that such Account Documentation is not part of any documentation used or usable by Merchant in transactions unrelated to the Program; e.g., sales invoices, in which event Merchant (and not Bank) shall be responsible for such costs. Bank shall also be solely responsible for the costs of embossing Credit Cards and mailing Credit Cards. Bank shall be solely responsible for the cost of producing Credit Cards and producing any mailer into which Credit Cards are enclosed. Upon implementation by Bank of all final Account Documentation and Operating Procedures, Bank shall indemnify Merchant and hold Merchant harmless as to any and all Losses incurred by Merchant as a result of non-compliance of same with Applicable Laws governing consumer credit. Merchant shall have no legal responsibility for compliance of same with Applicable Laws governing consumer credit, all of which shall be and remain the sole responsibility and obligation of the Bank, unless unauthorized changes to Account Documentation and Operating Procedures are made and/or omissions from same are made by Merchant without Bank's written authorization. Merchant shall indemnify Bank and hold Bank harmless from and with respect to any and all Losses incurred as a result of all such unauthorized changes and/or omissions. Bank also shall furnish and install, at its expense, such computer hardware and other, peripheral equipment, data capture machines, roll printers and computer software as Bank shall determine is necessary from time to time to maintain a Program interface between Merchant and Bank, which shall include, without limitation, up to five (5) data capture machines and roll printers per Store (until such time as integration of the Merchant's point-of-sale system with the Bank's authorizations and sales capture routines can be achieved after which time Bank may remove such equipment at any time at its option) and up to six (6) personal computers (with software) at Merchant's headquarters, if Merchant continues to process credits on a centralized basis, and up to two (2) personal computers (with software) per Store and one (1) such computer (with software) at headquarters, if the Merchant decentralizes such processing. All such equipment and software shall be and remain the property of the Bank. The Merchant shall provide rent-free space for, and reasonable access to, all such equipment. Bank shall maintain, repair and replace, as necessary, such equipment and software so as to maintain the Program interface and Merchant agrees to cooperate with, and assist, the Bank in such undertaking for the mutual benefit of Bank and Merchant.

Section 3.02. **Account Administration.** Bank, in its sole discretion, shall determine the creditworthiness of all Credit Card Applicants under the Program, and may periodically review the creditworthiness of Cardholders in order to determine the range of credit limits to be made available to individual Cardholders and whether to suspend or terminate credit privileges of any

Cardholder. Bank shall be identified to Cardholders as the creditor for all purposes.

Section 3.03. Ownership of Accounts. Bank shall be the sole and exclusive owner of all Accounts, Charge Transaction Data, Charge Slips, Credit Slips, receipts or evidences of payment for purchases by Cardholders and other Account Documentation. Subject to the provisions of Sections 4.01 and 9.02(i) below, Bank will establish, and may modify from time to time, finance charge rates and other charges with respect to the Accounts, payment procedures and all related terms, provided, however, that Bank will not impose an application, membership or similar fee on Cardholders or Credit Card Applicants, except upon consultation with, and, after obtaining the approval of, Merchant. Bank alone shall be entitled (i) to receive all payments made by Cardholders on all Accounts and (ii) to retain for its account all finance charges, returned check fees, late fees and, subject to the terms of, and/or any agreements between Bank and Merchant made pursuant to, the provisions of Section 3.06, all other fees and income, if any, collected with respect to Accounts. Merchant acknowledges and agrees that it has no right, title or interest in Accounts, Charge Transaction Data, Charge Slips, Credit Slips, receipts or evidences of payments for purchases by Cardholders or other Account Documentation and has no right to any payments made by Cardholders on Accounts, except to the extent set forth in Section 6.03 below and unless Merchant purchases the Accounts upon termination of this Agreement as set forth in Section 9.03(a) below.

Section 3.04. Sales Promotions. Bank shall offer Cardholders sales promotions from time to time, at the Bank's option, upon consultation with Merchant, which shall include, in any event, and without limitation, a "ninety (90) days same as cash" repayment option feature on initial purchases. The offering of such promotions shall be subject to limitation or discontinuance by Bank at any time from and after the second anniversary of the Effective Date, if either (A) the "payout rate" on such feature (meaning that Cardholders pay in full within such ninety (90) days' period), determined by Bank on a six (6) months' rolling average, is ever forty-five percent (45%) or more for ninety (90) consecutive days or more or (B) the Prime Rate ever exceeds eleven percent (11%) per annum, for so long as the Prime Rate so exceeds eleven percent (11%) per annum, provided that Bank gives Merchant at least thirty (30) days advance written notice of the imposition of such limitations or such discontinuance and unless, within such thirty (30) days' notice period, Bank and Merchant are able, using their collective best efforts in good faith, to renegotiate new terms for such promotions mutually acceptable to Merchant and Bank in lieu of such limitations being imposed or such discontinuance being effected.

Section 3.05. Credit Criteria. Bank shall, in its sole discretion, establish the credit criteria to be used in evaluating applicants in connection with the Program, with the understanding, as between the Merchant and Bank, that Bank, in good faith, will

endeavor at all times to maximize credit approvals and credit lines to approved applicants subject always to the terms and conditions of this Agreement. Bank may, in its sole discretion, modify such credit criteria from time to time as it deems necessary, consistent with the foregoing understanding and subject to the further understanding that if any such modification is anticipated by Bank to affect materially and adversely the level of then existing credit approvals and credit lines, Bank, in good faith, will endeavor to notify Merchant as soon as practicable prior to the implementation of such modification. Bank will review all Credit Card applications for Accounts submitted to Merchant by or on behalf of Credit Card Applicants and Bank will provide approval for credit those Credit Card Applicants which Bank determines are creditworthy based on such credit criteria and standards of acceptability and eligibility established by Bank, which may be revised from time to time by Bank in its sole discretion. Reliance by Bank at any time for purposes of making this determination on listings, reports, and/or other information furnished by or obtained from Merchant relating to Credit Card Applicants, Cardholders and/or Accounts as part of the Charge Transaction Data from time to time submitted by Merchant to Bank shall not limit Bank's right to revise standards of acceptability or eligibility at any time. The rejection for credit of any Credit Card Applicant under the Program, or any number of applicants, shall not give rise to any claim, liability, demand, offset, defense, counterclaim or other right or action (each a "Claim") by Merchant against Bank, and Merchant hereby waives and releases any such Claim that it may have against Bank. As to each Credit Card Applicant whose Credit Card application for an Account is accepted by Bank, Bank will from time to time establish the maximum amount of credit to be extended to each Cardholder, which may be changed by Bank at any time; provided, however, that specific credit approval shall be obtained from Bank by Merchant for each sale at the time of actual purchase.

    **Section 3.06.** **Insurance and Other Value-Added Programs.** Except as provided in Section 9.03(b) below, Bank shall not (and Bank shall not authorize any Person to) sell, solicit, or make commercial or other use of the names and addresses of any Cardholder including, without limitation, the solicitation of Value-Added Programs through the use of mail stuffers, inserts, advertising literature or attachments to or with any billing statements on Accounts unless and except to the extent that Merchant has given its prior written approval thereto, it being understood and agreed that Bank will reimburse Merchant's expenses and compensate Merchant in connection with each such Value-Added Program approved by Merchant, on such basis as Bank and Merchant shall mutually determine in connection with the initiation of such Value-Added Program. In connection with the foregoing, Bank and Merchant have agreed that Bank shall arrange for the marketing and sale of selected Insurance Programs to be identified as of the Effective Date, and specified in the Manual of Operating Procedures (all other, future Insurance Programs being subject to Merchant's right of prior approval and to mutual agreement between

Bank and Merchant as to Merchant's expense reimbursement and compensation, as set forth above). Initially, and continuing thereafter until the second anniversary of the Effective Date (thereafter to be determined by mutual agreement of the parties), Bank shall pay Merchant an expense reimbursement for enrolling Cardholders in any of the selected Insurance Programs. The expense reimbursement shall be paid once, in the amount of Four Dollars ($4.00), with respect to each Cardholder enrolled in one or more of such selected Insurance Programs. At the Merchant's option, and subsequent to the date on which the Merchant provides evidence of insurance licensing satisfactory to Bank, Bank will pay Merchant, in lieu of the foregoing expense reimbursement, compensation determined by reference to the following table:

| Insured % (Active Accounts) | % Premiums Billed Paid as Compensation to Merchant |
|---|---|
| 0 to 9.99 | 0 |
| 10 to 14.99 | 15 |
| 15 to 19.99 | 20 |
| 20 to 24.99 | 25 |
| 25 to 29.99 | 30 |
| 30 to 34.99 | 35 |
| 35 to 39.99 | 40 |
| 40 to 49.99 | 45 |
| 50 and over | 50 |

it being further understood and agreed by Bank and Merchant, however, that (a) if Bank hereafter purchases the credit card receivables covered by the Bank One Agreement as described in Section 2.09 hereinabove, then there shall be established separate penetration parameters for such credit card receivables purchased from Bank One (separate and apart from all other Accounts) to be mutually agreed upon by Merchant and Bank effective upon such purchase being consummated, but no less favorable to Merchant than the compensation determined by reference to the foregoing table, and (b) the compensation described hereinabove (including, without limitation, in the preceding clause (a)), shall be paid as a percentage of total premiums billed for such Insurance Programs and shall be subject to pro rata adjustment payable by Merchant to Bank if and to the extent that any such premiums must be returned to any Cardholder subsequently, with any such adjustments to be offset against compensation payable thereafter or, at Bank's option, collected directly upon presentation to Merchant of an invoice therefor. In regard to the foregoing, at Merchant's request, Bank will cooperate with, and assist, Merchant in becoming so licensed, and upon Bank's receipt of satisfactory evidence of such licensing, Bank will pay Merchant, in addition to any expense reimbursements then paid to Merchant, compensation determined in the aforedescribed manner on all then Active Accounts on which one or more Insurance Programs have been initiated since the Effective Date and then remain effective. Furthermore, if within thirty (30) days after the Bank One Agreement is terminated and the Program becomes operational, Merchant has not become so licensed, despite the collective best efforts of

Merchant and Bank that Merchant become licensed, Merchant and Bank shall determine, in mutual good faith, an alternative compensation method from that described above (likewise to replace the foregoing expense reimbursement) pending Merchant's becoming so licensed and, promptly thereafter, institute same on a mutually agreeable basis. If an alternative compensation method cannot be mutually determined by Bank and Merchant, then Merchant shall have the option to provide the Insurance Programs directly, in which event Bank shall be compensated for its efforts in administering the Insurance Programs in an amount equivalent to that amount which Bank would have received if Bank, rather than Merchant, were providing such Insurance Programs. In any event, Merchant will have no liability to Bank if any Value-Added Program approved by Merchant should not produce any income or result in a loss to Bank.

Section 3.07.    Retention of Documents.  Bank will at its option microfilm all Account Documentation and destroy all original Account Documentation in the ordinary course of business as Bank may see fit, in accordance with, and subject to, Applicable Law.

Section 3.08.    In-Store Payments.  Merchant shall not accept in-store payments on any Accounts.

Section 3.09.    Inserts.    Merchant may elect, at its option, to provide to Bank (at the address to be stated by Bank and using Bank's insert requirements as outlined in the Operating Procedures) inserts for customer billing statements. Merchant shall be responsible for the proper delivery, size and weight requirements of inserts and supply of insert stock. Merchant shall also be solely responsible for the costs of producing such inserts. The insertion service by Bank shall be at no cost to Merchant (up to a maximum of four (4) inserts, per billing statement per month) as long as all insert requirements have been met by Merchant, and the weight of such inserts does not cause any additional postage to be charged for such billing statements, in which event Merchant shall be obliged to reimburse Bank for such additional postage. Notwithstanding the foregoing, any insert required by law or regulation shall take precedence over any insert offered by Merchant. Merchant may also request that Bank place promotional messages in such space as may reasonably be available on Account billing statements at no additional cost to Merchant subject to any limitations imposed by Bank's reasonable needs, including by way of example and without limitation, Bank's billing statement systems configuration and Bank's needs to comply with any applicable law.

Section 3.10.    Administrative Support Functions.  Customer servicing regarding application processing, credit investigations, credit approvals or rejections, account information, all collection activity on delinquent accounts, billing and payment processing, delivery of notices and other communications required by Applicable Law and other administrative support functions shall be performed by Bank-authorized personnel at Bank's expense, acting

-16-

in accordance with Bank's usual standards in the context of its private label credit card business and Applicable Law.

Section 3.11. Program Manager. Merchant and Bank shall each assign an individual to serve as liaison responsible for support of the credit program described herein.

Section 3.12. Postage. Subject to the terms of Section 3.09 above, Bank will pay all postage expense incurred by it in connection with its administration or operation of the Program.

ARTICLE IV

OPERATING PROCEDURES

Section 4.01. General. Merchant agrees to follow such Operating Procedures as Bank shall establish from time to time in connection with the operation of the Program, including, without limitation, in regard to the distribution of Program materials, the processing of Credit Card Applications, the establishment of Accounts, the handling of transactions (including returns and credits), the transmission of Charge Transaction Data and the settlement of sums due. Initially, these Operating Procedures shall be as set forth hereinbelow in this Article IV and in the "Manual of Operating Procedures" which is attached hereto as Exhibit "B" and by reference made part of this Agreement. Modifications to such Operating Procedures made subsequent to the Effective Date shall be made subject to the terms of Section 9.02(i) below and, further, shall be made subject to the further requirement that, unless and except to the extent that any shorter advance notice period is required by Applicable Law, Bank first shall have given Merchant at least thirty (30) days advance written notice before their implementation, except that any such modifications involving promotional costs, finance charges, minimum monthly payments, returned check fees, late fees, membership fees, billing dates, minimum purchases and help desk and/or credit telephone numbers (with Bank personnel available to discuss credit decisions) shall be (i) preceded by at least sixty (60) days advance written notice by Bank to Merchant and (ii) subject further to the two (2) year limitation on modifications thereof set forth in the Manual of Operating Procedures.

Section 4.02. Purchase Authorization Procedures.

(a) Charge Slips. A Charge Slip must be completed for each Account transaction. The Cardholder's Account number must be on the Charge Slip. If the Cardholder does not have his/her Credit Card, the Store must call Bank's central credit office and request the Account number by providing the operator with the Cardholder's name, address and a valid form of positive identification being shown in accordance with the requirements respecting same set forth in the Manual of Operating Procedures.

(b) <u>Signatures</u>. Except for mail and telephone orders, Store personnel must have each Cardholder sign the Charge Slip, once all of the purchase information is filled in as requested. Cardholder's signature must be reasonably similar to that written on the back of the Credit Card. If Cardholder does not have his/her Credit Card, the signature on the Charge Slip must be reasonably similar to the signature on another valid form of identification provided by the Cardholder in accordance with the requirements respecting same set forth in the Manual of Operating Procedures. Mail and telephone orders may be processed, however, without the necessity of the Cardholder signing the Charge Slip, subject to Merchant's compliance with the Operating Procedures in regard to mail order and telephone sales.

(c) <u>Authorizations</u>. Merchant must obtain authorization for all purchases as to which Bank's computer system directs and records the authorization code on the Charge Slip. In the event that the authorization system is not in operation, Merchant must attempt to obtain authorization for all purchases by calling a toll-free telephone number which shall be provided by Bank.

<u>Section 4.03 Submission of Transaction Data</u>. Merchant shall promptly submit all Charge Transaction Data to Bank via electronic data transmission or daily computer tape and shall retain and store the Bank copy <u>(i.e.</u>, hard copy) of each Charge Slip or Credit Slip. Merchant shall retrieve and provide Bank with hard copies, which may be on paper or on microfiche film, of Charge Slips or Credit Slips when requested by Bank for customer services.

<u>Section 4.04. Receipt of Materials; Program Compliance</u>. Merchant agrees to comply fully with all Program procedures, policies, and guidelines set forth herein and, subject to the terms of Sections 4.01 and 9.02(i) below, as they are published from time to time in the Manual of Operating Procedures. Merchant understands that it can contact Bank's representatives for the Program at any time for information and assistance in assuring Merchant's full compliance. Merchant is solely responsible for the faithful performance of this Agreement by Merchant's officers, employees, representatives, consultants, contractors and agents.

ARTICLE V

<u>WARRANTIES AND COVENANTS</u>

<u>Section 5.01. Presentment Warranties of Merchant</u>. Merchant represents and warrants to Bank with respect to each Account (each and all of which shall survive the execution and delivery of this Agreement, and be deemed restated, renewed and reaffirmed with respect to each transaction each time Bank receives Charge Transaction Data from Merchant relative to each Account):

-18-

(a) <u>Bona Fide Sale</u>.    That the Charge Slip represents a bona fide sale by Merchant of the Goods and Services described in such Charge Slip and Merchant has delivered and/or provided for delivery of all the Goods and Services listed on such Charge Slip;

(b) <u>Signature</u>.    That the signature of the Cardholder on each of the Charge Slip, the Credit Card Agreement and the Credit Card Application is reasonably similar to the signature of the Cardholder on the Credit Card or the signature on other valid identification examined by the Store in compliance with applicable law;

(c) <u>No Alterations</u>.    That no dollar amounts on the Charge Slip have been altered by Merchant; and that no other data on the Charge Slip have been materially altered;

(d) <u>Not a Cash Advance</u>.    That the transaction giving rise to the Charge Transaction Data did not involve a cash advance or Goods and Services not listed on the Charge Slip and only Goods and Services sold by Merchant are the subject of the transaction;

(e) <u>Operating Procedures, Etc.</u>    That the transaction giving rise to the Charge Transaction Data was conducted by Merchant in all material respects in accordance with the requirements of Sections 4.01 and 4.02 above and the Operating Procedures; and that the Charge Transaction Data is not invalid, inaccurate, illegible or incomplete in any material respect;

(f) <u>Account Number</u>.    That the Account number of the Cardholder has been legibly printed or written on each Charge Slip;

(g) <u>No Liens</u>.    That Merchant has not received, directly or indirectly, and shall refuse to accept, any payment (in cash or property) for any charges which are actually listed as owing by the Cardholder on such Charge Slip (other than from Bank); and has not and shall not, either directly or indirectly, take or grant any right or security interest in any Charge Slip or Credit Slip (other than to Bank);

(h) <u>Laws</u>.    That the transaction giving rise to the Charge Transaction Data was conducted by Merchant in accordance with all Applicable Laws binding on Merchant that pertain to the sale of Goods and Services by Merchant hereunder; and

(i) <u>No Claim of Defense</u>.    That there is no fact nor any claim or defense of any Cardholder as to Merchant or with regard to any Goods or Services that would impair the validity, enforceability, or collectibility of the obligation of such Cardholder evidenced by the Charge Slip.

Section 5.02. <u>Account Covenants of Merchant</u>. Merchant covenants that it shall do the following during the term of this Agreement with respect to each transaction involving an Account or the Program:

(a) <u>Data</u>. Merchant shall transmit the Charge Transaction Data and Credit Slips to the Bank on a timely basis and in accordance with the Operating Procedures and shall use only Account Documentation approved by Bank and Merchant when taking any action with regard to the Program;

(b) <u>Dispute Resolution</u>. Merchant shall cooperate with Bank promptly to resolve all disputes with Cardholders;

(c) <u>Exchange Policy</u>. Merchant shall maintain a fair and equitable policy for the exchange and return of Goods and Services and shall promptly deliver a Credit Slip to the Cardholder and include credit for such return or adjustment in the Charge Transaction Data in accordance with the Operating Procedures;

(d) <u>No Discrimination</u>. Merchant shall not seek or obtain any special agreement or condition from, nor discriminate in any way against, any Cardholder with respect to the terms of any transaction; and

(e) <u>New Stores</u>. Subsequent to the Effective Date, Merchant shall give Bank at least sixty (60) days' advance written notice of the opening of any new Store within the State of Florida, and at least ninety (90) days' advance written notice of the opening of any new Store outside the State of Florida.

Section 5.03. <u>General Representations and Warranties of Merchant</u>. To induce Bank to establish and administer this Program, all as herein provided for, Merchant makes the following representations and warranties to the Bank, each and all of which shall survive the execution and delivery of this Agreement, and each and all of which shall be deemed to be restated and remade on each day on which any Account is opened, Charge Transaction Data are submitted or any action is taken by Merchant in the discharge of its obligations to Bank with respect to the Program.

(a) <u>Corporate Existence</u>. Merchant: (i) is a corporation duly organized, validly existing, and in good standing under the laws of the State of Florida; (ii) has the requisite corporate power and authority and the legal right to own, pledge, mortgage, and operate its properties, to lease the properties it operates under lease, and to conduct its business as now conducted and hereafter contemplated to be conducted; (iii) has all material licenses, permits, consents, or approvals from or by, and has given all material notices to, all governmental authorities having jurisdiction, to the extent required for the continuance, in all material respects, of such current ownership, lease or conduct and operation; and (iv) is in compliance with the provisions of its certificate or articles of incorporation and bylaws.

(b) <u>Corporate Power, Authorization; Enforceable Obligation</u>. The execution, delivery, and performance of this Agreement and all instruments and documents to be delivered by Merchant hereunder: (i) are within the corporate power of Merchant hereunder; (ii) have been duly authorized by all necessary or proper corporate action on the part of Merchant, including the consent of shareholders where required; (iii) are not in contravention of any provisions of the certificate of incorporation or bylaws of Merchant; (iv) will not violate any order or decree of any court or governmental instrumentality binding on Merchant; (v) except as set forth in, and subject expressly to the terms of, Section 2.09 above concerning the Bank One Agreement, will not violate the terms of any indenture, mortgage, deed of trust, lease, agreement, or other instrument to which Merchant is a party or by which Merchant or any of its property is bound; and (vi) except for the filing of financing statements, as provided in Section 2.08(d) above, do not require any filing or registration with or the consent or approval of any governmental body, agency, authority, or any other Person which has not been made or obtained previously. This Agreement has been duly executed and delivered by Merchant and constitutes a legal, valid, and binding obligation of Merchant enforceable against Merchant in accordance with its terms.

(c) <u>No Default</u>. Merchant, is not, to its knowledge, in material default (after giving effect to any applicable grace or notice periods) with respect to any contract, agreement or other instrument to which it is a party which instrument is material to the continued operation of Merchant's business; nor has Merchant received any notice of any such default. No Default or Event of Default relating to Merchant, as defined in Section 8.01, and no Default or Event of Default, as defined in Section 8.03, has occurred and is continuing.

(d) <u>Information Correct</u>. All information furnished by Merchant to Bank for purposes of or in connection with this Agreement and all such information hereafter furnished by Merchant to Bank, is true and correct in all material respects and no such information omits to state a material fact necessary to make the information so furnished not misleading.

(e) <u>Compliance with Bank Procedures</u>. With respect to each Credit Card Application, Account and the Program, every action taken by Merchant, its employees, Stores, or agents complies in all material respects with all procedures, including, but not limited to, the Operating Procedures, provided to Merchant by Bank.

(f) <u>Fiscal Year; Financial Statements</u>. That, as of the date hereof, the regular fiscal year used by Merchant for its accounting and financial reporting purposes ends on the 30th day of June in each year, and that Merchant will provide Bank, not later than ninety (90) days after each fiscal year end, audited annual financial reports for Merchant prepared in accordance with GAAP, consistently applied, together with such other information concerning

the financial condition, operations and business prospects of Merchant as Bank may reasonably request from time to time.

(g) <u>Solvency</u>. Merchant is Solvent.

Section 5.04. <u>Representations, Warranties and Covenants of Bank</u>. To induce Merchant to enter into this Agreement and participate in the Program, all as herein provided for, Bank makes the following representations, warranties and covenants to Merchant, each and all of which shall survive the execution and delivery of this Agreement, and each and all of which shall be deemed to be restated and remade on each day on which any Account is opened, Charge Transaction Data are received or any action is taken by Bank in the discharge of its obligations to Merchant with respect to the Program.

(a) <u>Corporate Existence</u>. Bank (i) is a bank duly organized, validly existing, and in good standing under the laws of the State of Georgia; (ii) has the requisite corporate power and authority and the legal right to conduct its business as now conducted; and (iii) is in compliance with its charter and bylaws.

(b) <u>Corporate Power, Authorization; Enforceable Obligations</u>. The execution, delivery, and performance of this Agreement and all instruments and documents to be delivered by Bank hereunder: (i) are within Bank's corporate power; (ii) have been duly authorized by all necessary or proper corporate action on the part of Bank, including the consent of shareholders when required; (iii) are not in contravention of any provisions of Bank's charter or bylaws; (iv) will not violate any order or decree of any court or governmental instrumentality binding on Bank; (v) will not violate the terms of any agreement to which Bank is a party or by which Bank or its property is bound; and (vi) except for the filing of financing statements, as provided in Section 2.08(d) above, do not require any filing or registration with or the consent or approval of any governmental body, agency, authority or any other Person which has not bee made or obtained previously. This Agreement has been duly executed and delivered by Bank, and constitutes a legal, valid, and binding obligation of Bank, enforceable against Bank in accordance with its terms.

(c) <u>No Default</u>. Bank is not, to its knowledge, in material default (after giving effect to any grace or cure periods) with respect to any contract, agreement or other instrument to which it is a party which is material to the continued operation of Bank's business; nor has Bank received any notice of any such default. No Default or Event of Default relating to Bank, as defined in Section 8.01, and no Default or Event of Default, as defined in Section 8.02, has occurred and is continuing.

(d) Information Correct. All information furnished by Bank to Merchant for purposes of or in connection with this Agreement and all such information hereafter furnished by Bank to Merchant, is true and correct in all material respects, and no such information omits to state a material fact necessary to make the information so furnished not misleading.

(e) Compliance with Bank Procedures. With respect to each Credit Card Application, Account and the Program, every action taken by Bank, its employees, or agents complies in all material respects with all procedures, including, but not limited to, the Operating Procedures, provided to Merchant by Bank.

(f) Solvency. Bank is Solvent.

## ARTICLE VI

## CHARGE BACK

Section 6.01. Bank's Right to Charge Back. Bank shall have the right to charge back to Merchant ten (10) Business Days after written notice thereof is received by Merchant from Bank (unless within such ten (10) Business Days' period the Bank has received evidence satisfactory to it that the claim giving rise to such charge back has been settled as between the Merchant and its Cardholder), the amount of any Charge Slip or Credit Slip if with respect to such Charge Slip or Credit Slip or the underlying transaction:

(a) Breach of Presentment Warranty. Any presentment warranty made by Merchant pursuant to Section 5.01 or Account covenant made by Merchant pursuant to Section 5.02 proves to be false or inaccurate in any respect, as determined by Bank;

(b) Asserted Defense. A Cardholder asserts any claim or defense against Bank as a result of any act or omission of Merchant allegedly in violation of any Applicable Law;

(c) Disputes. A Cardholder disputes the amount or existence of such Account or refuses to pay alleging dissatisfaction with Goods and Services received, a breach of any warranty or representation by Merchant in connection with the Transaction, or an offset or counterclaim against Bank based on an act or omission of Merchant.

(d) Dissatisfaction With Goods. Any Cardholder refuses to pay alleging non-delivery of Goods or Services claimed to have been sold, dissatisfaction with Goods or Services received, a breach of any warranty, or representation by Merchant in connection with the transaction, or any offset, or counterclaim against Bank based on an act or omission of Merchant provided any such dispute constitutes bona fide claims presented by Cardholders in good faith in the reasonable opinion of Bank.

-23-

(e) __Missing Charge Slip__. Any Cardholder disputes a Charge Slip and Merchant cannot supply Bank with a legible copy (which may be paper or microfiche film) of the Charge Slip within ten (10) days of Bank's request therefor.

__Section 6.02.__    __Limitation of Chargeback__.  After providing at least ten (10) Business Days' written notice to Merchant of its intent to charge back any Charge Slip (or portion thereof), as contemplated under Section 6.01, Bank may compromise and settle any claim made by any Cardholder and charge back to Merchant up to the face amount of any Charge Slip or Credit Slip plus accrued finance charges, late fees and other charges, if any, relating to such compromise or settlement, unless, within the aforesaid notice period, Bank has received evidence satisfactory to it of the type contemplated in Section 6.01 of the settlement of such claim as between Merchant and such Cardholder.  In the event of any such compromise or settlement, Bank shall adjust the Cardholder's Account and Bank's right to charge back shall be limited to the actual amount so compromised.

__Section 6.03.__    __Exercise of Chargeback__.  If Bank exercises its right to charge back in accordance with this Agreement, Bank shall set off amounts charged back against any sums due Merchant under this Agreement or, if chargebacks exceed sums due Merchant, Bank may demand and Merchant shall pay Bank on demand the full amount of such excess in immediately available funds. If any Charge Slip, or portion thereof, is charged back, Bank shall assign to Merchant, without recourse, representation or warranty to Merchant, Bank's right to collect from its Cardholder the amount of such Charge Slip (or portion thereof, to the extent of partial charge back), for collection by Merchant.

ARTICLE VII

SETTLEMENT; CHARGES

__Section 7.01.__    __Settlement__.  All Charge Transaction Data presented to Bank will be verified and processed by Bank.  Bank will forward to Merchant the full amount shown as the total of purchases reflected in Charge Slips included in such verified Charge Transaction Data presented, __less__ (i) the total amount of any Credit Slips submitted by Merchant, (ii) any discount fees imposed by Bank to Merchant under Section 7.02 below, (iii) any volume adjustment fees charged by Bank to Merchant under Section 7.03 below, and (iv) any amounts which are permitted to be charged back to Merchant under this Agreement, or which may be offset pursuant to Section 12.01 below (the "__Settlement Amount__"), by initiation of a wire transfer as follows: (i) if the electronic data transmission or daily computer tape reflecting such Charge Transaction Data sent by Merchant is received by Bank by 6:00 a.m. Eastern Time on a Business Day, Bank shall forward the Settlement Amount by initiating a wire transfer of funds for the Settlement Amount by 1:00 p.m. Eastern Time on the same said Business Day; and (ii)

-24-

if Bank receives electronic data transmissions or daily computer tapes from Merchant after 6:00 a.m. Eastern Time on any Business Day, such electronic data transmissions or daily computer tapes shall be deemed received by 6:00 a.m. Eastern Time the following Business Day, and Bank shall forward the Settlement Amount by initiating a wire transfer for the Settlement Amount by 1:00 p.m. Eastern Time on such following Business Day, except that if an electronic transmission or daily computer tape for Charge Transaction Data is received by Bank by midnight Eastern Time on any Saturday, Sunday or other day not a Business Day Bank will initiate a wire transfer of funds for the Settlement Amount for such Charge Transaction Data by 1:00 p.m. Eastern Time on the next Business Day. All calculations to be performed pursuant to this Agreement as of a relevant Billing Date shall be based upon transactions summarized as of the various Billing Dates during a calendar month. If, and to the extent that, at any time hereafter, the Settlement Amount is ever negative, Merchant shall, immediately upon receipt of notice of such imbalance from Bank, pay Bank the amount which then remains owing to it or, in lieu thereof, at the Bank's option, the Bank may offset such amount against the next day's or days', as the case may be, Settlement Amount provided that Bank gives notice thereof to Merchant after such offset right has been exercised and provided further, that upon such offset(s) being completed as to the entirety of such sums, Merchant shall have no further obligation of direct payment to the Bank. Except as set forth expressly in Section 3.06 above, in Article VI above, in this Section 7.01, in Section 10.01 below or in Section 12.01 below, all Settlement Amounts paid to Merchant by Bank shall be received by Merchant without recourse and without any liability or obligation to Bank to repay, rebate or return to Bank any amount thereof.

Section 7.02. Discount. Merchant shall pay Bank a discount fee during each calendar month from and after the Effective Date in which, as of the first day of such calendar month, the Prime Rate exceeds twelve percent (12%), equal in amount to the product of (i) a fraction, expressed as a percentage, equal in amount to the sum of two-tenths of one percent (.2%) for each whole integral of one-fourth of one percent (1/4%) by which the Prime Rate exceeds twelve percent (12%) times, (ii) daily Volume during each day in such calendar month, payable monthly in arrears on the last day of each such calendar month. The amount of any discount fee payable to Bank under this Section 7.02 first shall be deducted by Bank from any promotional expense reimbursements then owing by Bank to Merchant pursuant to Section 2.03, to the extent (if any) thereof, and, secondly, be charged as deductions to the Settlement Amount as provided in Section 7.01.

Section 7.03. Volume Adjustment Fee. Commencing on the third anniversary of the Effective Date, and continuing thereafter on each successive such anniversary date, if Bank's Volume for the annual period concluding on such anniversary date has been less than Fifteen Million Dollars ($15,000,000), Merchant shall pay each year, within fifteen (15) days after receipt from the Bank of

an invoice in such regard, a fee to Bank equal to one percent (1%) of the difference between Fifteen Million Dollars ($15,000,000) and Bank's actual Volume for such annual period.

ARTICLE VIII

EVENTS OF DEFAULT; RIGHT AND REMEDIES

Section 8.01.    Events of Default: The occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an Event of Default hereunder:

(a) Non-Payment. A party hereto shall fail to make any payment of any amount due pursuant to this Agreement when due and payable or declared due and payable pursuant to this Agreement, and the same shall remain unremedied to the non-defaulting party's satisfaction for a period of ten (10) days after the non-defaulting party shall have made written demand therefor.

(b) Non-Performance. A party hereto shall fail or neglect to perform, keep, or observe any item, provision, condition, or covenant contained in this Agreement that is required to be performed, kept, or observed, and the same shall remain unremedied to the non-defaulting party's satisfaction for a period of thirty (30) days after the non-defaulting party shall have given written notice thereof.

(c) Misrepresentation. Any material representation, warranty or statement made or delivered by a party hereto or any of its respective officers, employees, agents or representatives shall not be true and correct as of the date when made or reaffirmed, and the same shall remain unremedied to the non-defaulting party's satisfaction for a period of three (3) Business Days' after the defaulting party shall have received written notice thereof from the non-defaulting party.

(d) Judgment. Final judgment or judgments for the payment of money shall be rendered against a party hereto in the amount of Two Hundred Fifty Thousand Dollars ($250,000) or more, and the same shall not be either (i) covered by insurance or the insurer shall not have accepted liability therefor or (ii) vacated, stayed, bonded, paid, or discharged prior to expiration of the applicable appeal period or otherwise remedied to the satisfaction of the non-defaulting party within thirty (30) days after the defaulting party shall have received written notice of the declaration of a default hereunder resulting therefrom by the non-defaulting party.

Section 8.02.    Bank Events of Default: The occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute a Bank Event of Default hereunder:

-26-

(a) <u>Receivership</u>. The Federal Deposit Insurance Corporation or any other regulatory authority having jurisdiction over Bank shall order the appointment of a custodian, receiver, liquidator, assignee, trustee, or sequestrator (or similar official) of Bank or of any substantial part of its properties, or order the winding up or liquidation of the affairs of Bank, and such order shall not be vacated, discharged, stayed, or bonded within thirty (30) days from the date of entry thereof.

(b) <u>Insolvency</u>. Bank shall (i) consent to the institution of proceedings specified in (a) above or to the filing of any such petition or to the appointment of or taking possession by a custo-dian, receiver, liquidator, assignee, trustee, or sequestrator (or similar official) of Bank of any substantial part of its proper-ties, (ii) cease to be Solvent, or (iii) take corporate action in furtherance of any such action.

Section 8.03. <u>Merchant Events of Default</u>. The occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute a Merchant Event of Default hereunder:

(a) <u>Involuntary Bankruptcy</u>. A decree or order by a court having jurisdiction (i) for relief in respect of Merchant pursuant to the Bankruptcy Code or any other applicable bankruptcy or other similar law, (ii) for appointment of a custodian, receiver, liqui-dator, assignee, trustee, or sequestrator (or similar official) of Merchant of any substantial part of its properties or, (iii) ordering the winding-up or liquidation of the affairs of Merchant shall be entered, and shall not be vacated, discharged, stayed or bonded within thirty (30) days from the date of entry thereof.

(b) <u>Voluntary Bankruptcy</u>. Merchant shall (i) file a peti-tion seeking relief pursuant to the Bankruptcy Code or any other applicable bankruptcy or other similar law, (ii) consent to the institution of proceedings pursuant thereto or to the filing of any such petition or to the appointment of or taking possession by a custodian, receiver, liquidator, assignee, trustee, or seques-trator (or similar official) of Merchant and substantial part of its properties (iii) cease to be Solvent, or (iv) take corporate action in furtherance of any such action; or (v) there shall be a substantial and materially adverse cessation of Merchant's regular course of business.

(c) <u>Material Adverse Change</u>. Merchant shall sell all, or substantially all, of its assets; or be dissolved as a corpora-tion; or be the subject of any takeover, reorganization, recapi-talization, merger or consolidation; or cease to be able to obtain credit for its ongoing operations; or, otherwise, there shall oc-cur any change in the operations, assets, condition (financial or otherwise), business or ownership of Merchant which Bank, in the reasonable exercise of Bank's sole judgment, determines materially and adversely affects, or is reasonably likely to affect materi-ally and adversely, Merchant's ability to perform its obligations

-27-

hereunder  or under the Program and thirty (30) days after receipt of written notice from Bank to such effect, Merchant is unable  to cause  such  change  to be corrected, insured against or otherwise remedied in a manner satisfactory to Bank.

Section 8.04.  Remedies.  Upon the occurrence of an Event  of Default   pursuant   to  Sections 8.01, 8.02 or 8.03,  the non-defaulting party, in its sole discretion, may suspend or refuse to continue  to  perform its obligations under this Agreement and de-mand that all outstanding obligations of the defaulting  party  be paid  and performed immediately.  In addition, the relevant provi-sions of Article IX below shall apply.

ARTICLE IX

TERM/TERMINATION

Section 9.01.  Term.  This Agreement shall continue  in  full force  and  effect  until five (5) years from the date hereof (the "Initial Term") and shall be renewed automatically for  successive five (5) year terms ("Renewal Term(s)")  thereafter, unless termi-nated as provided in Section 9.02 below.

Section 9.02.  Grounds for Termination.  This  Agreement  is subject  to  termination at or prior to the expiration of the Ini-tial Term or any Renewal Term as follows:

(a)  End of Term.  At least one  hundred  eighty  (180)  days prior to the final day of the Initial Term or any Renewal Term, as the case may be, either party hereto may provide written notice to the  other expressing its intent to terminate this Agreement, with such termination to be effective as of the final day of such  Ini-tial Term or Renewal Term, as the case may be, in which event this Agreement shall terminate, effective as of the final  day  of  the Initial  Term or Renewal Term, as the case may be, notwithstanding any contrary intent or action of the other party.

(b)  Early Optional Termination Without Cause.  Either  party may, without cause, terminate this Agreement as of any anniversary of the Effective Date concluding on or after the second  such  an-niversary date by providing advance written notice to the other to such effect at least (A) one hundred eighty (180) days,  prior  to an anniversary date, in the case of any such notice of termination given with respect to the second anniversary date, and (B)  ninety (90) days prior to any other anniversary date (except for a termi-nation at end of term, which shall continue to be governed by sub-section  (a) above), in which event this Agreement shall terminate effective as of the anniversary date specified in such  notice  of early termination.

(c) <u>Maximum Investment</u>.  If at any time the amount of funds invested by Bank in the Program reaches an amount equal to ninety percent (90%) of the Maximum Investment, Bank will give written notice to Merchant thereof and of its intent either to increase or not increase the Maximum Investment, in its credit judgment, within ninety (90) days therefrom; and in the event that either (i) Bank does not give notice that it will increase the Maximum Investment by at least ten percent (10%) within such ninety (90) day period or (ii) Bank notifies Merchant during such period expressly that Bank will not increase the Maximum Investment, then, either party hereto shall have the right to terminate this Agreement pursuant to the provisions of this Article IX upon the expiration of a period of one hundred eighty (180) days after the date of receipt of such initial notice from Bank to Merchant by giving written notice to the other to such effect not more than thirty (30) days after such initial ninety (90) days notice has been given by Bank.

(d) <u>Changed Program Economics</u>.  If Bank ever determines that any one or more of the following conditions, existing individually or in tandem, based on a six (6) months' rolling average, has or have existed for a period of ninety (90) days or more, to-wit: (i) Bank's approval ratio for Credit Card Applicants is less than thirty-five percent (35%) for such period, (ii) fraud losses suffered by Bank, as a percentage of Average Portfolio Balance for such period, exceed three-tenths of one percent (.3%) for such period, (iii) total losses suffered by Bank, as a percentage of Average Portfolio Balance for such period, exceed six and one-half percent (6-1/2%) for such period or (iv) the Average Portfolio Balance per Account for such period is less than Seven Hundred Dollars ($700), then, Bank shall have the right, exercisable by giving Merchant at least thirty (30) days advance written notice to such effect, to seek renegotiation of the pricing parameters of the Program with Merchant and, if Bank and Merchant are unable to reach mutual agreement on the revision of such parameters within such notice period as provided by Bank, then Bank shall have the right, at the conclusion of such notice period, or at any time within sixty (60) days thereafter, to terminate early this Agreement by giving written notice to such effect to Merchant of at least (A) one hundred eighty (180) days, if such option is exercised by Bank prior to the second anniversary of the Effective Date and (B) ninety (90) days thereafter, in which event this Agreement shall terminate effective as of the date specified in such notice of early termination.  Merchant shall have the independent right to terminate early this Agreement at any time hereafter during which Bank's approval ratio for Credit Card Applicants is less than thirty-five percent (35%) for ninety (90) days or more, based on a six (6) months' rolling average, upon first giving Bank at least ninety (90) days' advance notice of intended early termination, in which event such termination shall become effective as of the date specified in such notice of early termination.

(e) <u>Bank Event of Default</u>.  Merchant shall have the independent right to terminate this Agreement if an Event of Default relating to the Bank under Section 8.01 above or a Bank Event of Default under Section 8.02 above shall occur and continue past any applicable notice and cure period.

(f) <u>Merchant Event of Default</u>.  Bank shall have the independent right to terminate this Agreement if an Event of Default relating to Merchant under Section 8.01 above or a Merchant Event of Default under Section 8.03 above shall occur and continue past any applicable notice and cure period.

(g) <u>Change in Law</u>.  Notwithstanding anything to the contrary contained in this Agreement, Bank may engage Merchant in renegotiation of this Agreement if (i) usury rates of the State of Georgia change in a materially adverse manner to Bank (ii) Applicable Laws regulating Bank change in a manner which materially and adversely affects, or may materially and adversely affect, Bank's ability to perform hereunder or Bank's average yield for the Program, (iii) federal or state regulation preempts the exportation of Bank's rate structure or (iv) Bank's average yield for the Program decreases as a result of a new State being added to the Program, upon first giving Merchant written notice to such effect, specifying the grounds.  If new terms acceptable to both parties cannot be reached within ninety (90) days after the date that the Merchant receives such notice, then this Agreement shall be deemed terminated as of the one hundred eightieth (180th) day after receipt of such notice by Merchant or earlier, if required by law.

(h) <u>Termination for Force Majeure</u>.  This Agreement may be terminated by either Bank or Merchant after the passing of one hundred and eighty (180) days following the notice by one party to the other that its performance hereunder is prevented or materially impeded, without the ability to cure, by one of the following force majeure events:  acts of God, fire, earthquake, explosion, accident, computer failure, war, nuclear disaster, riot or material changes in applicable laws or regulations, including but not limited to a change in state or federal law rendering it illegal, impossible or untenable for the notifying party or its ultimate parent corporation to perform as contemplated in this Agreement. Any such failure to perform shall not be considered a breach of this Agreement during the period of such disability (<u>i.e.</u>, prior to the one hundred eighty (180) days expiring), if the disabled party promptly advises the other party in writing that it is unable to perform due to such a force majeure event, setting forth: (i) the nature of the event; (ii) its expected effect(s) and duration; (iii) any expected development which may further affect performance hereunder; and (iv) the efforts which in the sole, reasonable judgment and discretion of such notifying party shall be made to cure (if possible) such force majeure event or provide substitute performance (if possible).  Such one hundred and eighty (180) day period may be shortened upon written agreement executed by duly authorized officers of both parties or if required by applicable law or regulation.

(i) <u>Changed Operating Procedures</u>. If, pursuant to Section 4.01 above, the Bank should change the Operating Procedures subsequent to the Effective Date in any manner which materially and adversely affects the Merchant, the Merchant shall have the right to terminate this Agreement, <u>subject, however</u>, to the following terms and conditions: (a) the change shall have had a material and adverse effect on the Merchant's business operations or financial condition in the reasonable exercise of the Merchant's sole judgment; (b) within thirty (30) days after such change has become effective, the Merchant shall have notified the Bank in writing of its intent to terminate this Agreement pursuant to this subsection (i), citing how the change has had such a material and adverse effect; (c) within sixty (60) days after the Bank shall have received such notice of intended termination from the Merchant, the Bank and the Merchant, after bargaining in mutual good faith, shall have been unable to resolve the Merchant's concern in regard to such change; and (d) a total of ninety (90) additional days shall have passed after the conclusion of the sixty (60) days "cooling off" period specified in clause (c) above (assuming no resolution by the end of such period). During all such periods prescribed above, the change imposed by the Bank which gave rise to the termination right shall remain fully effective, however.

(j) <u>Bank One Agreement</u>. This Agreement may also be terminated by either Bank or Merchant if the Bank One Agreement is not terminated within ninety (90) days after the Effective Date, as provided more particularly in, and subject to the provisions of, Section 2.09 above.

<u>Section 9.03</u>. <u>Rights and Duties Upon Termination</u>. In the event of the expiration or any termination of this Agreement:

(a) <u>Purchase of Accounts</u>. Merchant shall have the option to purchase, or to arrange for a third party acceptable to Bank to purchase, all outstanding Accounts <u>excluding, however</u>, any Accounts (or portions thereof) which, as of the date of purchase, have been written off by the Bank, or, even if not then written off, are eight payments or more due (the net amount of Accounts which would be required to be purchased by Merchant if the foregoing option is exercised herein called the <u>"Net Accounts"</u>) at a price equal to the sum of (A) one hundred percent (100%) of the aggregate unpaid principal balance of all such Net Accounts as shown on the books and records of Bank, <u>plus</u> all finance and other charges accrued, but unpaid (including, without limitation, any such charges which are then unbilled) on such Net Accounts, <u>plus</u>, (B) the sum of all out-of-pocket expenses then paid or incurred by Bank in the collection or attempted collection of all such Net Accounts, including, without limitation, attorneys' fees, for which the Cardholder is liable by contract and/or applicable law, which are then billed, or thereafter can be billed in the next billing cycle, to the Cardholder <u>plus</u> (C) all fees and charges then owing by Merchant to Bank under this Agreement. If Merchant exercises the option granted by this subsection (a), Bank shall retain all

-31-

Accounts other than the Net Accounts purchased by Merchant. The right of the Merchant to exercise the option granted by this sub-section (a) shall terminate on the earlier of (i) the effective date of the expiration or any termination of this Agreement or (ii) sixty (60) days from the date on which either Merchant or Bank delivers written notice of termination to the other pursuant to Section 9.02. If Merchant exercises its option to purchase (or arrange for the purchase of) all Net Accounts, Bank shall provide to any acceptable purchaser of Net Accounts a master file computer tape listing all Net Accounts upon receiving full payment of the purchase price from such purchaser; and, prior thereto, the Bank shall provide such performance data and other non-proprietary data which the Bank has derived internally concerning Net Accounts to be purchased as the Merchant may reasonably request be furnished to it or any third party acceptable to the Bank, subject, however, to any legal limitations thereon to which the Bank is or may be subject and to such contractual limitations as the Bank may impose in regard to the confidentiality thereof; and Bank otherwise will cooperate in all reasonable respects with Merchant and such pur-chaser in an orderly and timely manner to facilitate such pur-chase. Any such purchase by or arranged through Merchant must be for all Net Accounts, must be completed on or before the date of expiration or termination of this Agreement and must be funded and serviced, in its entirety, by Merchant, its designated purchaser or a financial institution other than Bank or any Bank affiliate. Any such sale of Net Accounts shall be made without recourse, rep-resentation or warranty by Bank, except as to the accuracy, in all material respects, of the information relative to the Net Accounts in the master file computer file and other data concerning the Net Accounts supplied by Bank to Merchant in connection with such pur-chase and sale, and, once made, shall vest in the purchaser all of the Bank's right, title and interest therein and in the Account Documentation pertaining thereto. If Merchant or an acceptable third party does not purchase the Net Accounts as provided in this subsection (a), then, Bank shall liquidate the Accounts as pro-vided in subsection (b) below, and Merchant shall pay to Bank the liquidation fees prescribed in subsection (c) below.

(b) Liquidation. If Merchant is unable or unwilling to pur-chase, or arrange for the purchase of, the Net Accounts in the manner and subject to the conditions described in Section 9.03(a) above, Bank shall have the right, in addition to and retaining all other rights it may have under the terms of this Agreement or Applicable Law, to liquidate the Accounts in any lawful manner which may be expeditious or economically advantageous to Bank, including, without limitation, by the sale, (or authorization to another Person to sell) in whole or in part, of the Accounts and/or any Account Documentation (including, without limitation, the names and addresses of any Credit Card Applicants and Cardholders), or by the issuance of a replacement or substitute bank credit card, or by some combination thereof or otherwise, and Bank may use the Merchant's name in communicating with existing customers until all Accounts are liquidated. Merchant expressly agrees to cooperate with Bank and take any action to effectuate

any such liquidation or replacement or substitute card issuance in an orderly manner, including, but not limited to, (i) at Bank's request, accepting existing Credit Cards for at least thirty-six (36) months following the effective date of termination, and (ii) at Bank's request, accepting replacement or substitute Credit Cards following the date of termination for at least thirty-six (36) months following the effective date of termination.

(c) <u>Liquidation Fee</u>. During any period in which, pursuant to subsection (b) above, Accounts are being liquidated by Bank, Merchant shall be obliged to pay a monthly liquidation fee to Bank equal to ninety cents ($.90) per each Net Account constituting an Active Account until the <u>earlier</u> of: (i) that date on which all such Net Accounts have been liquidated, whether by their payment in full by the Cardholder, by their being written off (or being deemed so by their being eight or more payments due), by their transfer to a replacement or substitute credit card or otherwise as the Bank shall determine or (ii) three (3) years after such liquidation period shall have begun. In addition, during any liquidation period, any obligation of Bank for the payment of fees otherwise owing by Bank to Merchant pursuant to Section 2.03 (promotional assistance) and Section 3.06 (participation in Value-Added Programs) shall be discontinued.

Section 9.04. <u>Effect of Termination</u>.

(a) <u>Continuing Duties</u>. During any period after which notice of termination has been given by either party, each party shall fulfill its respective obligations under this Agreement (unless prohibited by law) including, without limitation, Section 9.03 above, until all Accounts are liquidated or other disposition made thereof.

(b) <u>No Limitation on Powers</u>. Except as otherwise expressly provided herein, the expiration or any termination of this Agreement shall in no way affect or impair the powers, obligations, duties, rights and liabilities of Merchant or Bank, including, without limitation, those under Article IX hereof, relating to any transaction or event occurring prior to such termination.

(c) <u>Limitations on Licenses</u>. Notwithstanding the expiration or any termination of this Agreement for any reason, (i) the license granted to Bank pursuant to Section 2.05 shall continue in effect after the effective date of the expiration or any termination of the Program for so long as any Account remains open and any billing statement must be sent under applicable law, rule or regulation and (ii) the power of attorney granted to Bank pursuant to Section 11.01 shall continue in effect for so long as there is any unpaid balance on any Account.

(d) <u>Survival</u>. All undertakings, agreements, covenants, warranties, representations and indemnities contained herein shall survive the termination of this Agreement, except as specifically provided herein to the contrary. Without in any manner limiting

-33-

the generality of the foregoing, upon such termination, Bank shall continue to own Accounts and Indebtedness (unless purchased by Merchant or its designee pursuant to the provisions of Section 9.03(a) above), and, except as otherwise provided herein, Merchant or Bank (as the case may be) shall continue to be liable for all obligations set forth herein applicable to it until such time as the Bank shall no longer own Accounts.

## ARTICLE X

### INDEMNIFICATION

Section 10.01. Indemnification by Merchant. Merchant agrees to protect, indemnify, and hold harmless Bank, its subsidiaries, and affiliated companies, and the employees, officers, and directors thereof, against any and all Losses arising out of, connected with or resulting from: (a) Credit Card sales of Goods and Services; (b) any transaction, contract, understanding, promise, representation, or any other relationship, actual, asserted, or alleged, between Merchant and any Cardholder relating to an Account; (c) any Goods and Services the purchase of which was financed by an Account; (d) any other act by Merchant or its employees, officers, directors, shareholders, agents or any independent contractors hired by Merchant (herein "Merchant Personnel"), or omission by Merchant or any Merchant Personnel where there was a duty to act, relating to an Account or items of Indebtedness relating to an Account; (e) any claim, demand, allegation, offset, defense, or counterclaim which, if true or proven, would constitute a breach under subsections (a) through (d) of this Section 10.01; or (f) any breach by Merchant or any Merchant Personnel of any of the terms, covenants, representations, warranties, conditions precedent, or other provisions contained in this Agreement or any other instrument or document delivered by Merchant or any Merchant Personnel to Bank in connection herewith or therewith; provided, however, that excluded from the foregoing indemnity shall be any liability, cost, expense, judgment, damage, claim, demand, offset, defense, counterclaim, action, proceeding or other loss, to the extent the same arises out of or results from any violation by Bank, its subsidiaries or affiliated companies or any Bank Personnel (as hereinafter defined) of any Applicable Law, this Agreement, any Credit Card Agreement, or any other agreement, understanding or promise between Bank and any Cardholder relating to such Cardholder's Account or the Program.

Section 10.02. Indemnification by Bank. Bank agrees to protect, indemnify, and hold harmless Merchant, its subsidiaries, and affiliated companies, and the employees, officers, and directors thereof, against any and all Losses arising out of, connected with or resulting from: .(a) any transaction, contract, understanding, promise, representation, or any relationship, actual, asserted, or alleged, between Bank and any Cardholder relating to any Account; (b) any breach by Bank or its employees, officers, directors, shareholders, agents or licensees or any independent contractors

hired by Bank (herein, "<u>Bank Personnel</u>") of any of the terms, rep-
resentations, warranties, covenants or other provisions of this
Agreement or any other instrument or document delivered by Bank or
any Bank Personnel to Merchant in connection herewith or there-
with; or any event, act or omission that would be such a breach if
any term, covenant, representation, warranty, or other provision
did not contain a requirement of materiality; or (c) any other act
by Bank or any Bank Personnel, or omission by Bank or any Bank
Personnel where there was a duty to act, relating to an Account or
items of Indebtedness sold under an Account; provided, however,
that excluded from the foregoing indemnity shall be any liability,
cost, expense, judgment, damage, claim, demand, offset, defense,
counterclaim, action proceeding or other loss, to the extent the
same arises out of or results from any violation by Merchant, its
subsidiaries and affiliated companies or any Merchant Personnel
of any Applicable Law, this Agreement, any Credit Card Agreement
or any other agreement, understanding or promise between Merchant
and any Cardholder relating to such Cardholder's Account or the
Program.

    <u>Section 10.03</u>. <u>Defense of Claims</u>. In the event that any
legal proceeding shall be instituted or that any claim or demand
shall be asserted by any Person in respect of which payment may be
sought by one party hereto from another pursuant to this
Article X, the party seeking indemnification shall promptly cause
written notice of the assertion of any claim of which it has
knowledge which is covered by this indemnity to be forwarded to
the other party, which shall have the right, to the extent of its
indemnification, at its option and at its own expense, to be rep-
resented by counsel of its choice and to defend against, negoti-
ate, settle, or otherwise deal with any proceeding, claim, or de-
mand which is related to any loss, liability, damage, or defi-
ciency indemnified against hereunder. The parties hereto agree to
cooperate fully with the defense, negotiation, or settlement of
any such legal proceeding, claim or demand.

    <u>Section 10.04</u>. <u>Payment of Indemnified Amounts</u>. After any
final judgment or award shall have been rendered by a court, arbi-
tration board, or administrative agency of competent jurisdiction,
or a settlement agreed to by both parties shall have been consum-
mated, the party seeking indemnification shall forward to the
other party notice of any sums due and owing by it with respect to
such matter and such party shall be required to pay all of the
sums so owing to the party seeking indemnification within thirty
(30) days after the date of such notice.

ARTICLE XI

MISCELLANEOUS

Section 11.01.    Power of Attorney.  Merchant authorizes and empowers Bank (a) to sign and endorse Merchant's name on all checks, drafts, money orders or other forms of payment with regard to Accounts under the Agreement; (b) to do all the things reasonably necessary to carry out or enforce the Account; and (c) to do any and all other things which Bank determines is necessary or advisable to do to carry out the terms of this Agreement.  This limited power of attorney conferred hereby shall be deemed a power coupled with an interest and shall be irrevocable while any Account remains unpaid.

Section 11.02.    Securitization/Participation.    Bank shall have the right to securitize or participate all or any portion of the Accounts at any time.  Any repurchase right(s) which Merchant may have under this Agreement shall be subject to Bank's right to securitize or participate and shall be enforceable only with respect to Accounts and/or any portion thereof owned by Bank at the time of such repurchase; provided, however, that any such securitization or participation of all or any portion of the Accounts by Bank shall be upon such terms as will enable Bank to make all Accounts outstanding at the time of any termination of this Agreement available for purchase in the event of the exercise by Merchant of its option for Merchant or a third party to purchase all outstanding Accounts pursuant to Section 9.03(a) above.

Section 11.03.  Assignment.  Neither party hereto may assign this Agreement or any of its respective rights hereunder or delegate any of its obligations hereunder without the prior written consent of the other party, which consent shall not unreasonably be withheld, provided, however, that Bank may assign this Agreement to any subsidiary or affiliate of Bank which is then legally and financially capable of performing Bank's obligations hereunder with notice to, but without the necessity of obtaining any consent from, Merchant.

Section 11.04.  Amendment.  This Agreement may not be amended except by written instrument signed by both Bank and Merchant.

Section 11.05.  Non-Waiver.  No delay by either party hereto in exercising any of its rights hereunder, or partial or single exercise of such rights, shall operate as a waiver of that or any other right.  The exercise of one or more of either party's rights hereunder shall not be a waiver of, nor preclude the exercise of, any rights or remedies available to such party under this Agreement or in law or at equity.

Section 11.06.  Severability.  If any provision of this Agreement is held to be invalid, void or unenforceable, all other provisions shall remain valid and be enforced and construed as if such invalid provision were never a part of this Agreement.

Section 11.07.  Governing Law.  This Agreement and all rights and obligations hereunder, including, but not limited to, matters of construction, validity and performance, shall be governed by and construed in accordance with the laws of the State of Georgia, without regard to internal principles of conflict of laws, and applicable federal law.

Section 11.08.  Captions.  Captions of the articles and sections of this Agreement are for convenient reference only and are not intended as a summary of such Sections and do not affect, limit, modify or construe the contents thereof.

Section 11.09.  Notices.  Any notice required or permitted under this Agreement shall be deemed to have been received on the fifth (5th) calendar day after being posted if such notice is sent by first class U.S. mail, certified return receipt requested,

if to Merchant to:      Sound Advice, Inc.
                        1901 Tigertail Boulevard
                        Dania, Florida  33004
                        Attn:  Mr. Peter Beshouri, President and
                               Chief Executive Officer

with a copy to:         Alan D. Axelrod, Esq.
                        Ruben Baum Levin Constant
                        Friedman & Bilzin
                        2500 Southeast Financial Center
                        Miami, Florida  33131

and if to Bank to:      Monogram Credit Card Bank of Georgia
                        1000 Holcomb Woods Parkway
                        Roswell, Georgia 30076
                        Attention: President

with a copy to:         Monogram Credit Card Bank of Georgia
                        260 Long Ridge Road
                        Stamford, Connecticut 06927
                        Attention: Counsel

provided, however, that if any of the above parties shall have designated a different address by notice to the other, then to the last address so designated.  In addition, either party hereto shall have the right to give notice by personal delivery or by electronic facsimile to the other party at its designated address.

Section 11.10.  Access.  Bank (by any of its approved officers, employees and/or agents, each of which, in each instance, shall be necessary for the purposes hereof), shall have the right, during normal business hours and in such a manner as to minimize interference with Merchant's normal business operations, and the normal business operations of Merchant's affiliates, to examine, audit, inspect and make extracts (collectively "review"), at Bank's sole cost and expense, from all of the records, files and

-37-

books of account of Merchant concerning the Accounts and the transactions contemplated under this Agreement, and Merchant shall use its best efforts to facilitate Bank's exercise of the review right created hereunder. To effectuate the foregoing, Merchant shall deliver any document or instrument necessary for Bank to obtain records from any Person maintaining records for Merchant and shall maintain records or media pursuant to its regular record retention policy, and Merchant shall make available information from banking and other financial institutions, to Bank, at Bank's reasonable request. No information as to which Bank has been given access pursuant hereto shall be used or disclosed for any purpose other than in accordance with this Agreement.

Section 11.11. <u>Further Assurances</u>. Merchant and Bank each agree to produce or execute such other documents or agreements as may be necessary or desirable for the execution and implementation of this Agreement and the consummation of the transactions contemplated hereby.

Section 11.12. <u>Entire Agreement</u>. This Agreement contains the entire agreement of the parties hereto with respect to the subject matter hereof, and supersedes and replaces all agreements, oral or written, heretofore made with respect to the subject matter of this Agreement.

Section 11.13. <u>Binding Effect</u>. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

Section 11.14. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, all of which together shall constitute one and the same instrument, but in making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart.

Section 11.15. <u>Arrangements With Third Parties</u>. During the term of this Agreement and any extension or renewal thereof, Merchant agrees with Bank that Merchant will NOT: (i) create internally, or enter into any arrangement or agreement, oral or written, with another credit card provider to create a credit card program which is similar in purpose or effect to this Agreement for customers of Merchant, (ii) advertise, promote or make available to customers of Merchant, or solicit or permit the solicitation of customers of Merchant to participate in, any other credit card program offered either by Merchant or by another credit card provider which is similar in purpose or effect to this Program, (iii) retain for its own account or offer to any other credit provider any application submitted for consumer credit at any Store unless and to the limited extent that Bank, after solicitation by Merchant through presentation of such application, has elected not to include such customer in the Program and, then, only as to each such excluded customer and not otherwise or (iv) grant any license or other permission to any Person to use, nor permit any other Person to use, the Marks in connection with any other credit card

-38-

program other than in connection with any such program offered to any customers of Merchant theretofore specifically excluded from the Program by Bank, as described more particularly in clause (iii) hereinabove. Nothing contained herein shall prevent or impair the Merchant's right or ability to accept existing proprietary credit cards heretofore issued, new proprietary credit cards hereafter issued (after Bank has elected not to exercise its right of first refusal), and all non-proprietary credit cards, such as Mastercard, VISA, Discover, Diners Club and American Express, or for Merchant to maintain layaway programs from time to time or to sell Goods on open account (without financing) from time to time.

### ARTICLE XII

### OFFSET RIGHT; SECURITY INTEREST

Section 12.01. **Right of Offset.** Bank shall at all times have the right to offset against any sums owing by Bank to Merchant hereunder any sums owing by Merchant to Bank hereunder, if then due, and whether or not elsewhere specifically provided hereinabove as to such remittances.

Section 12.02. **Security Interest.** The parties hereto intend that the transactions contemplated herein shall constitute a program for the extension of consumer credit and service to customers of Merchant by Bank; however, in recognition of the potential applicability of Article 9 of the UCC to the transactions contemplated hereby, and to secure payment of and performance by Merchant of any and all indebtedness, liabilities or obligations whatsoever of Merchant to Bank however arising, whether pursuant to this Agreement or otherwise, including liabilities and obligations that may be deemed to exist in the event of the applicability of Article 9 of the UCC to, and any recharacterization of, any transactions contemplated hereby, Merchant hereby grants to Bank a continuing security interest in and to the following property or interests in property of Merchant whether now existing or hereafter created or acquired, together with the proceeds thereof: (i) any Goods returned by a Cardholder on any such Account until Bank receives payment from Merchant with respect to the Account pursuant to which the Goods were purchased; (ii) all Accounts and Account Documentation which may from time to time become subject to this Agreement; (iii) all deposits, credit balances and/or any reserves on Bank's books relative to any Accounts; and (iv) all proceeds of the foregoing; in each case, free and clear of any other liens or security interests thereon except, in regard to the Goods described in clause (i) above, any prior security interest of any existing vendor or financier described on Schedule 12.02 hereto retaining a perfected security interest in such Goods continuing therein upon their return. Merchant agrees to cooperate fully with Bank as Bank may reasonably request in order to give effect to the security interest granted by this Section 12.02 including, without limitation, by the filing of UCC-1 financing

statements or comparable statements in order to perfect such security interest.  In furtherance of the foregoing,  Merchant  hereby certifies to Bank that the address of its principal place of business, chief executive office and office where it keeps  its  books and  records  (including  all  books and records pertaining to the Program) is at the address specified in  the  initial  recital  to this  Agreement; and Merchant agrees not to change such address or remove its books and records from such  address  hereafter  unless Merchant  first  has  given Bank at least thirty (30) days advance written notice thereof and, in connection therewith,  executed  in Bank's  favor  any  amendments to existing financing statements or comparable statements or new such statements, as the case may  be, which  Bank  then  determines  to  be  necessary  to  reflect such changes.  In connection with the foregoing, as soon as practicable after  the Effective Date, the Merchant shall use its best efforts (without necessity of payment of any fees, charges or  other  monies,  however)  to  obtain  a  lien  waiver, lien subordination or other, similar agreement on terms reasonably satisfactory to  Bank and  its  counsel  from each  secured creditor listed on Schedule 12.02 hereto; but, failure by Merchant to obtain any one  or  more of  such  agreements,  after using such best efforts, shall not be considered an Event of Default by Merchant under this Agreement.

## ARTICLE XIII

### FIXED FUNDING ELECTION

At any time or from time to time hereafter, Bank  shall  have the  continuing right, at its option, to purchase an interest rate "hedge" or similar contract or product for an amount equal to  all or  a  portion  of its Investment, for a term equal to the term of this Agreement or any lesser term, and at  an  interest  rate,  or series  of  interest rates, which from time to time Bank shall determine, all in its sole discretion  (herein,  a  "hedge").   Bank agrees with Merchant, however, that if Bank's Investment ever exceeds Twenty-Five Million Dollars  ($25,000,000),  Merchant  shall have  the  right to request that Bank purchase a hedge for its entire Investment for the then remaining term of  the  Agreement  on such  basis  as  Merchant  and Bank then shall mutually determine, subject to availability and subject, further, to the Bank  receiving  an  indemnity acceptable  to it from Merchant as to the cost thereof and any loss thereunder.  Not less than ten (10) days  before  any  such hedge is contemplated to be purchased by the Bank, the Bank shall offer to Merchant the option of either (i)  accepting changed pricing parameters, as then determined by Bank, within the Program resulting from Bank's purchase of such  hedge,  should such  hedge  be  purchased  or (ii) keeping the pricing parameters within the Program, as then currently effective, unchanged;  which option shall be exercisable by Merchant in writing within ten (10) days after receipt of such offer from Bank (and Merchant's failure to  respond  to  such  offer within such period shall be deemed to constitute its agreement to keep the aforementioned pricing parameters unchanged).

IN WITNESS WHEREOF, the Bank and Merchant have set their hands hereto as of the date of this Agreement.

"MERCHANT"

SOUND ADVICE, INC.

By: _____

     Title: President / CEO

Received and accepted in Atlanta, Georgia, this 12 day of August, 1992.

"BANK"

MONOGRAM CREDIT CARD BANK OF GEORGIA

By: _____

     Title: Vice President

-41-

## AMENDMENT

Amendment dated as of June 14, 1996 to the Credit Card Program Agreement by and between Sound Advice, Inc. ("Merchant") and Monogram Credit Card Bank of Georgia (the "Bank") dated as of August 12, 1992, as amended from time to time (the "Agreement").

The Agreement is hereby amended as follows:

1.   Section 1.01 is hereby amended by adding a definition of "Commercial Paper Rate" as follows and by deleting the definition of "Maximum Investment" and replacing it in its entirety as follows:

""Commercial Paper Rate" shall mean the rate for so-called ninety (90) day high-grade unsecured notes sold through dealers by major corporations in multiples of one thousand dollars ($1,000) as published by The Wall Street Journal in its "Money Rates" section under the heading "Commercial Paper" (or if such publication is discontinued, such other publication of similar type designated by the Bank), on any Business Day that such rate is published, whether or not such rate is actually charged or paid by an entity.

"Maximum Investment"  shall mean the maximum amount of credit which Bank is at any one time willing to extend to Cardholders under the Program and shall mean Fifty-Five Million Dollars ($55,000,000) or such other amount as Bank, in its sole discretion, may at any time or from time to time specify to Merchant, subject to the limitation in Section 9.02(c)."

2.   Section 3.04 shall be renamed "Service Fees" and such section is hereby deleted in its entirety and replaced with the following:

"3.04 Service Fees.  Bank shall charge to Merchant a service fee for purchases made under the Program charged to Accounts. The service fees Bank shall charge to Merchant with respect to purchases are set forth on the matrix attached hereto as Schedule 3.04, where the Commercial Paper Rate referenced on the vertical axis thereof shall refer to the Commercial Paper Rate in effect on the first day of the calendar quarter preceding such sale and the reference on the horizontal axis thereof shall refer to the terms of such purchase.  Bank shall have the right to review the service fee schedule quarterly during the Initial Term and any Renewal Term and may change such schedule in whole or in part in its sole discretion upon at least fifteen (15) days prior written notice to Merchant; provided that Bank shall not change the service fee applicable to any Purchase made pursuant to a

specified sales promotion initiated during one calendar quarter provided such sales promotion terminates within thirty (30) days of the beginning of the following calendar quarter.  Bank will provide Merchant in advance with any changed service fee schedule concurrently with the aforesaid fifteen (15) days prior written notice.  Bank hereby agrees that any changes made to the service fee schedule shall be made in good faith and shall be commercially reasonable based on comparable Bank credit card programs in the appliance and electronic industry and the sales and portfolio performance under the Program.  Bank shall review with Merchant the basis for any such increase and provide Merchant with backup documentation to support any such increase.  Any service fees imposed hereunder will be deducted daily by Bank from amounts paid to Merchant under Section 7.01 hereof."

3.  A new Section 5.05 is added to the Agreement to read as follows:

"Section 5.05.  General Covenants of Merchant.

(a) Merchant's Sales of Extended Warranties.  Merchant is permitted to sell extended warranties and to finance those warranties on the Credit Card with the prior approval of Bank. Bank has given approval for Merchant to sell for financing on the Credit Card extended warranties (including the "future discount" feature) issued by National Electronics Warranty Corporation and its affiliates (collectively, "NEW").  It is understood that Bank has negotiated an arrangement with NEW under which NEW has agreed to fulfill the terms of all NEW warranties sold by Merchant on NEW's behalf. Merchant represents that NEW warranties are the only extended warranty contracts it currently sells and covenants that it will not sell and charge to the Credit Card any extended warranty contracts except NEW warranties without Bank's specific prior written approval.  Merchant will promptly advise Bank if any warranties now in effect other than NEW warranties and other than the "future discount" feature offered prior to July 1994 were financed under the Program, and if so, will provide Bank with information Bank reasonably requests in order to gauge any exposure to Bank.   Such information is expected to include numbers of such warranties sold, purchase years and prices, terms and utilization experience, as well as information about arrangements in place to service such warranties. If for any reason, Bank determines that the exposures associated with warranties sold by Merchant have not been satisfactorily addressed, Bank may, upon notice to Merchant, create and maintain reserves on Bank's books and fund such reserves by deducting from payments it makes to Merchant under Section 7.01 hereof, sufficient funds to ameliorate such exposures (or, in Bank's sole discretion, permit Merchant to provide an alternative form of collateral to ameliorate such exposure).

(b) <u>Sales Incentive Programs</u>. Merchant represents that the the only products or services financed under the Program which require Merchant or a third party to fulfill an obligation in the future (such as the sale of merchandise permitting a later trade-up) are listed on Exhibit 5.05(b) hereto and covenants that it will not, without Bank's specific prior written approval, offer any other product or service requiring future performance. Additionally, Merchant will provide Bank with information Bank reasonably requests to gauge any exposure to Bank. This information is expected to include descriptions of each such program and redemption history. Merchant shall promptly address to Bank's satisfaction any issues identified by Bank associated with the exposure surrounding any such sales incentive program(s). If for any reason, Bank determines that the exposure associated with Merchant's sales incentive programs has not been fully addressed, Bank may, upon at least ten (10) days prior written notice to Merchant, create and maintain reasonable reserves on Bank's books and fund such reserves by deducting from payments it makes to Merchant under Section 7.01 hereof, sufficient funds to ameliorate such exposures (or in Bank's sole discretion, permit Merchant to provide an alternative form of collateral to ameliorate such exposure)."

4.  The word "offset" is changed to "recoup or offset" in Sections 6.03 and 12.01 and in the 37th line of Section 7.01; the word "offset" is changed to "recouped or offset" in the 10th line of Section 7.01 and the word "offset" is changed to "recoupment or offset" in the 39th and 40th lines of Section 7.01.

5.  Section 8.03(c) is hereby deleted and replaced with the following:

    "(c) <u>Material Adverse Change</u>. Merchant shall sell all, or substantially all, of its assets; or be dissolved as a corporation; or be the subject of any takeover, reorganization, recapitalization, merger or consolidation; or cease to be able to obtain credit for its ongoing operations; or, otherwise, there shall occur any change in the operations, assets, condition (financial or otherwise), business or ownership of Merchant, or any change in its status or relationship with other creditors (including without limitation, inability to obtain ongoing long term financing from other creditors as existing facilities expire), which Bank, in the reasonable exercise of Bank's sole judgment, determines materially and adversely affects, or is reasonably likely to affect materially and adversely, Merchant's ability to perform its obligations hereunder or under the Program."

6.    Section 9.01 shall be amended by changing the word "five (5)" in the second line thereof to the word "seven (7)."

7.    Section 9.02(b) shall be deleted in its entirety (and shall be deemed a section "Intentionally Omitted)."

8.    Section 9.02(c) is hereby deleted and replaced with the following:

"(c)  Maximum Investment.  Bank shall be under no obligation to accept new Credit Card Applications or extend further credit under the Program if further extensions of credit would cause the amount of funds invested by Bank in the Program at any time to exceed the Maximum Investment.  If at any time the amount of funds invested by Bank in the Program reaches an amount equal to or greater than the Maximum Investment, Bank will have the right to terminate this Agreement or to continue extending credit and establishing Accounts. If Bank elects to extend credit in excess of the Maximum Investment, it may cease to do so at any time and any extension of credit in excess of the Maximum Investment in any amount shall not obligate Bank to continue to extend credit in excess of the Maximum Investment. Merchant expressly acknowledges Bank's right to establish the Maximum Investment and, in this regard, hereby releases Bank from, and indemnifies Bank against, any and all Losses incurred as a result of Bank refusing to advance credit to Cardholders in accordance with Section 2.01 as a result of reaching the Maximum Investment, or to increase the Maximum Investment, including any lender liability claim. Bank will advise Merchant when the amount of funds invested by Bank in the Program reaches 95% of the Maximum Investment and the parties will then discuss and cooperate on next steps. If the amount of funds invested by Bank in the Program reaches or exceeds the Maximum Investment and Bank does not extend further credit under the Program, then either party shall have the right to terminate this Agreement immediately upon notice to the other party.  Additionally, Bank may lower the Maximum Investment only if the resulting Maximum Investment is sufficient to meet reasonably anticipated utilization for the remaining term of the Agreement, based on Merchant's sales forecasts.

9.    Section 9.03 through the end of subsection (b) thereof is hereby amended in its entirety as follows:

"Section 9.03.  Rights and Duties Upon Termination

(a)  Purchase of Accounts.  In the event of any termination of this Agreement except pursuant to Section 9.02(f), Merchant shall have the option to purchase, or to arrange for a third party to purchase, all outstanding Accounts, excluding, however,

any Accounts (or portions thereof) which, as of the date of purchase, have been written off by the Bank, or even if not then written off, are eight payments or more due (the net amount of Accounts which would be required to be purchased by Merchant if the foregoing option is exercised herein called the "Net Accounts") at a price equal to the sum of (a) one hundred percent (100%) of the aggregate unpaid principal balance of all such Net Accounts, plus all finance charges and other charges accrued, but unpaid (including, without limitation, any such charges which are then unbilled and all finance charges relating to unexpired promotional offerings) on such Net Accounts plus, (B) the sum of all out-of-pocket expenses then paid or incurred by Bank in the collection or attempted collection of all such Net Accounts, including, without limitation, attorneys' fees, for which the Cardholder is liable by contract and/or applicable law, which are then billed, or thereafter can be billed in the next Billing Cycle, to the Cardholder plus (C) all fees and charges then owing by Merchant to Bank under this Agreement. If Merchant exercises the option granted by this subsection (a), Bank shall retain all Accounts other than the Net Accounts purchased by Merchant. The right of the Merchant to exercise the option granted by this subsection (a) shall terminate on the earlier of (i) the effective date of the expiration or any termination of this Agreement or (ii) sixty (60) days from the date on which either Merchant or Bank delivers written notice of termination to the other pursuant to Section 9.02. If Merchant exercises its option to purchase (or arrange for the purchase of) all Net Accounts, Bank shall provide to any acceptable purchaser of Net Accounts a master file computer tape listing all Net Accounts upon receiving full payment of the purchase price from such purchaser; and, prior thereto, the Bank shall provide such performance data and other non-proprietary data which the Bank has derived internally concerning Net Accounts to be purchased as the Merchant may reasonably request be furnished to it or any third party acceptable to the Bank, subject, however, to any legal limitations thereon to which the Bank is or may be subject and to such contractual limitations as the Bank may impose in regard to the confidentiality thereof; and Bank otherwise will cooperate in all reasonable respects with Merchant and such purchaser in an orderly and timely manner to facilitate such purchase. Any such purchase by or arranged through Merchant must be for all Net Accounts, must be completed on or before the date of expiration or termination of this Agreement and must be funded and serviced, in its entirety, by Merchant, its designated purchaser or a financial institution other than Bank or any Bank affiliate. Any such sale of Net Accounts shall be made without recourse, representation or warranty by Bank, except as to the accuracy, in all material respects, of the information relative to the Net Accounts in the master file computer file and other data concerning the Net Accounts supplied by Bank to Merchant in

connection with such purchase and sale, and, once made, shall vest in the purchaser all of the Bank's right, title and interest therein and in the Account Documentation pertaining thereto. If Merchant does not have the right to or does not elect to purchase or have a third party purchase the Net Accounts as provided in subsection (a), then Bank shall liquidate the Accounts as provided in subsection (b) below, and Merchant shall pay to Bank the liquidation fees prescribed in subsection (c) below.

(b) <u>Liquidation.</u> If Merchant does not exercise its option to purchase the Net Accounts pursuant to Section 9.03(a) hereof, or is unable or unwilling to purchase, or arrange for the purchase of, the Net Accounts, or if this Agreement is terminated in a manner which does not give rise to Merchant's right to purchase the Accounts, as provided in Section 9.03(a), Bank shall have the right, in addition to and retaining all other rights it may have under the terms of this Agreement or Applicable Law, to liquidate the Accounts in any lawful manner, including, without limitation, by the sale (or authorization to another Person to sell) in whole or in part, of the Accounts, the Account Documentation, the names and addresses of any Credit Card Applicants or Cardholders, or any other lists or information of or relating to Cardholders, to cause the Credit Cards to be accepted at locations other than Stores at Bank's discretion, to issue a replacement or substitute credit card (or to authorize or arrange with a third party to do so), or by any combination of actions or remedies Bank deems advisable (individually, a "Liquidation Strategy" and collectively "Liquidation Strategies"). Merchant hereby authorizes the use of Merchant's name in communicating with Cardholders in connection with liquidating existing Accounts as of the time of termination and until all such Accounts are liquidated or 36 months, whichever occurs first, without further authorization or consent of Merchant; provided that if a Liquidation Strategy is pursued under which the Credit Card is or will be accepted only at locations other than the Stores, the Bank's right to use Merchant's name in connection with charges on existing Accounts generated at such retail outlets other than Stores shall expire six months after the later of (i) the last day the Credit Card is accepted at any Store, or (ii) the effective termination date of this Agreement. Merchant hereby acknowledges that it has no right in and to the Accounts, Account Documentation, Credit Cards or any other documents used in connection with the Program, except to the extent purchased in a purchase transaction pursuant to Section 9.03(a) hereof, and Merchant expressly agrees to cooperate with Bank, and take any action to effectuate any Liquidation Strategy elected by Bank, in an orderly manner, including, but not limited to, accepting the Credit Card or any replacement or substitute card for up to 36 months following the effective date of termination, as determined by Bank."

10.  Section 9.03(c) shall remain in full force and effect.

11.  Section 11.15 is hereby amended in its entirety to read as follows:

"Until the date on which this Agreement terminates, Merchant will not, unless Bank shall otherwise consent in writing, sponsor, make available, or enter into the provision of, any program for providing goods or services on credit to customers of Merchant, including, without limitation, any credit card program, other than (v) credit provided in connection with the Program hereunder; (w) credit provided by generally accepted non co-branded multipurpose credit or charge cards such as American Express, MasterCard, VISA and Discover; (x) open account (net 30 day) credit extended directly by Merchant to selected customers which remains on Merchant's books and is not sold or assigned to any third party; (y) credit provided in connection with the program currently in effect between Merchant and Mitsubishi; and (z) credit provided in connection with any application submitted for consumer credit at any Store which is declined by Bank; provided that Bank shall have the first right of refusal to offer or arrange for any such "second sourcing" program for declined applications."

12.  Article XIII shall be deleted in its entirety.

13.  Except as otherwise provided herein, the Agreement remains in full force and effect.

14.  Capitalized terms used herein without further definition shall have the meanings ascribed to them in the Agreement.

15.  This Amendment shall become effective between the parties on the date hereof.

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date set forth above.

SOUND ADVICE, INC.                   MONOGRAM CREDIT CARD BANK OF GEORGIA

By: _____                By: _____

Name: _Peter Beshouri_               Name: _William E. Johnson_

Title: _President_                   Title: _Vice President_

| COMMERCIAL PAPER RATE | 90-DAYS AFF | 180-DAYS AFF | 180-DAYS SKIP/FREE | 9-MOS AFF | 9-MOS SKIP/FREE | 12-MOS AFF w/pyt | 12-MOS AFF | 12-MOS FREE/PYT SKIP/FREE | 12-MOS SKIP/FREE |
|---|---|---|---|---|---|---|---|---|---|
| 4.60% | | 4.20% | 7.20% | 7.16% | 8.75% | 6.99% | 7.72% | 10.43% | 10.82% |
| 4.70% | | 4.26% | 7.26% | 7.23% | 8.81% | 7.06% | 7.79% | 10.50% | 10.89% |
| 4.80% | | 4.31% | 7.31% | 7.29% | 8.87% | 7.14% | 7.87% | 10.57% | 10.97% |
| 4.90% | | 4.36% | 7.36% | 7.36% | 8.93% | 7.21% | 7.94% | 10.64% | 11.04% |
| 5.00% | | 4.41% | 7.41% | 7.42% | 9.00% | 7.28% | 8.02% | 10.71% | 11.12% |
| 5.10% | | 4.46% | 7.46% | 7.49% | 9.06% | 7.35% | 8.10% | 10.79% | 11.19% |
| 5.20% | | 4.52% | 7.51% | 7.55% | 9.12% | 7.42% | 8.17% | 10.86% | 11.27% |
| 5.30% | | 4.57% | 7.56% | 7.62% | 9.18% | 7.50% | 8.25% | 10.93% | 11.34% |
| 5.40% | | 4.62% | 7.61% | 7.68% | 9.24% | 7.57% | 0.333% | 11.00% | 11.42% |
| 5.50% | | 4.67% | 7.66% | 7.75% | 9.30% | 7.64% | 8.40% | 11.07% | 11.49% |
| 5.60% | | 4.72% | 7.71% | 7.81% | 9.36% | 7.71% | 8.48% | 11.15% | 11.56% |
| 5.70% | | 4.77% | 7.76% | 7.88% | 9.42% | 7.78% | 8.56% | 11.22% | 11.64% |
| 5.80% | | 4.83% | 7.81% | 7.94% | 9.48% | 7.86% | 8.63% | 11.29% | 11.71% |
| 5.90% | | 4.88% | 7.86% | 8.01% | 9.54% | 7.93% | 8.71% | 11.36% | 11.79% |
| 6.00% | | 4.93% | 7.91% | 8.07% | 9.60% | 8.00% | 8.79% | 11.44% | 11.86% |
| 6.10% | | 4.98% | 7.96% | 8.14% | 9.66% | 8.07% | 8.86% | 11.51% | 11.94% |
| 6.20% | | 5.03% | 0.01% | 8.20% | 9.72% | 8.14% | 8.94% | 11.58% | 12.01% |
| 6.30% | | 5.09% | 8.07% | 8.27% | 9.78% | 8.21% | 9.02% | 11.65% | 12.08% |
| 6.40% | | 5.14% | 8.12% | 8.33% | 9.85% | 8.29% | 9.09% | 11.72% | 12.16% |
| 6.50% | | 5.19% | 8.17% | 8.40% | 9.91% | 8.36% | 9.17% | 11.80% | 12.23% |
| 6.60% | | 5.24% | 8.22% | 8.46% | 9.97% | 8.43% | 9.25% | 11.87% | 12.31% |
| 6.70% | | 5.29% | 8.27% | 8.53% | 10.03% | 8.50% | 9.32% | 11.94% | 12.38% |
| 6.80% | | 5.34% | 8.32% | 8.59% | 10.09% | 8.57% | 9.40% | 12.01% | 12.46% |
| 6.90% | | 5.40% | 8.37% | 8.66% | 10.15% | 8.65% | 9.48% | 12.09% | 12.53% |
| 7.00% | | 5.45% | 8.42% | 8.72% | 10.21% | 8.72% | 9.55% | 12.16% | 12.61% |
| 7.10% | | 5.50% | 8.47% | 8.79% | 10.27% | 8.79% | 9.63% | 12.23% | 12.68% |
| 7.20% | | 5.55% | 8.52% | 8.86% | 10.33% | 8.86% | 9.71% | 12.30% | 12.75% |
| 7.30% | | 5.60% | 8.57% | 8.92% | 10.39% | 8.93% | 9.78% | 12.37% | 12.83% |
| 7.40% | | 5.66% | 8.62% | 8.99% | 10.45% | 9.01% | 9.86% | 12.45% | 12.90% |
| 7.50% | | 5.71% | 8.67% | 9.05% | 10.51% | 9.08% | 9.94% | 12.52% | 12.98% |
| 7.60% | | 5.76% | 8.72% | 9.12% | 10.57% | 9.15% | 10.01% | 12.59% | 13.05% |
| 7.70% | | 5.81% | 8.77% | 9.18% | 10.63% | 9.22% | 10.09% | 12.66% | 13.13% |
| 7.80% | | 5.86% | 8.02% | 9.25% | 10.69% | 9.29% | 10.17% | 12.74% | 13.20% |

Schedule 3.04

SCHEDULE 3.04

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 7.90% | | 5.91% | 8.87% | 9.31% | 10.76% | 9.37% | 10.24% | 12.81% | 13.28% |
| 8.00% | | 5.97% | 8.93% | 9.36% | 10.82% | 9.44% | 10.32% | 12.80% | 13.35% |
| 8.10% | | 6.02% | 8.98% | 9.44% | 10.88% | 9.51% | 10.40% | 12.95% | 13.42% |
| 8.20% | | 6.07% | 9.03% | 9.51% | 10.94% | 9.58% | 10.47% | 13.02% | 13.50% |
| 8.30% | | 6.12% | 9.08% | 9.57% | 11.00% | 9.65% | 10.55% | 13.10% | 13.57% |
| 8.40% | | 6.17% | 9.13% | 9.64% | 11.06% | 9.72% | 10.63% | 13.17% | 13.65% |
| 8.50% | 2.08% | 6.23% | 9.18% | 9.70% | 11.12% | 9.80% | 10.70% | 13.24% | 13.72% |
| 8.60% | 2.14% | 6.28% | 9.23% | 9.77% | 11.18% | 9.87% | 10.78% | 13.31% | 13.80% |
| 8.70% | 2.19% | 6.33% | 9.28% | 9.83% | 11.24% | 9.94% | 10.86% | 13.39% | 13.87% |
| 8.80% | 2.25% | 6.38% | 9.33% | 9.90% | 11.30% | 10.01% | 10.93% | 13.46% | 13.94% |
| 8.90% | 2.31% | 6.43% | 9.38% | 9.96% | 11.36% | 10.08% | 11.01% | 13.53% | 14.02% |
| 9.00% | 2.36% | 6.48% | 9.43% | 10.03% | 11.42% | 10.16% | 11.09% | 13.60% | 14.09% |
| 9.10% | 2.42% | 6.54% | 9.48% | 10.09% | 11.48% | 10.23% | 11.16% | 13.67% | 14.17% |
| 9.20% | 2.48% | 6.59% | 9.53% | 10.16% | 11.54% | 10.30% | 11.24% | 13.75% | 14.24% |
| 9.30% | 2.53% | 6.64% | 9.58% | 10.22% | 11.61% | 10.37% | 11.32% | 13.82% | 14.32% |
| 9.40% | 2.59% | 6.69% | 9.63% | 10.29% | 11.67% | 10.44% | 11.39% | 13.89% | 14.39% |
| 9.50% | 2.65% | 6.74% | 9.68% | 10.35% | 11.73% | 10.52% | 11.47% | 13.96% | 14.47% |
| 9.60% | 2.70% | 6.80% | 9.74% | 10.42% | 11.79% | 10.59% | 11.54% | 14.04% | 14.54% |
| 9.70% | 2.76% | 6.85% | 9.79% | 10.48% | 11.85% | 10.66% | 11.62% | 14.11% | 14.61% |
| 9.80% | 2.82% | 6.90% | 9.84% | 10.55% | 11.91% | 10.73% | 11.70% | 14.18% | 14.69% |
| 9.90% | 2.88% | 6.95% | 9.89% | 10.61% | 11.97% | 10.80% | 11.77% | 14.25% | 14.76% |
| 10.00% | 2.93% | 7.00% | 9.94% | 10.68% | 12.03% | 10.88% | 11.85% | 14.32% | 14.84% |
| 10.10% | 2.99% | 7.05% | 9.99% | 10.74% | 12.09% | 10.95% | 11.93% | 14.40% | 14.91% |
| 10.20% | 3.05% | 7.11% | 10.04% | 10.81% | 12.15% | 11.02% | 12.00% | 14.47% | 14.99% |
| 10.30% | 3.10% | 7.16% | 10.09% | 10.87% | 12.21% | 11.09% | 12.08% | 14.54% | 15.06% |
| 10.40% | 3.16% | 7.21% | 10.14% | 10.94% | 12.27% | 11.16% | 12.16% | 14.61% | 15.14% |
| 10.50% | 3.22% | 7.26% | 10.19% | 11.00% | 12.33% | 11.23% | 12.23% | 14.68% | 15.21% |
| 10.60% | 3.27% | 7.31% | 10.24% | 11.07% | 12.39% | 11.31% | 12.31% | 14.76% | 15.28% |
| 10.70% | 3.33% | 7.36% | 10.29% | 11.13% | 12.46% | 11.38% | 12.39% | 14.83% | 15.36% |
| 10.80% | 3.39% | 7.42% | 10.34% | 11.20% | 12.52% | 11.45% | 12.46% | 14.90% | 15.43% |
| 10.90% | 3.44% | 7.47% | 10.39% | 11.26% | 12.58% | 11.52% | 12.54% | 14.97% | 15.51% |
| 11.00% | 3.50% | 7.52% | 10.44% | 11.33% | 12.64% | 11.59% | 12.62% | 15.05% | 15.58% |

Exhibit 5.05(b)

**Mobile Reinstall Program**

Any car stereo purchased from and installed by Sound Advice can
be reinstalled in the customer's new car at no charge to the
customer.   Limited to only one reinstall per customer. Does not
include alarm systems and custom installations.

**One-Year Speaker Trade-Up Policy**

Sound Advice will give the full value of the purchase price of
any home or car stereo speaker purchased from Sound Advice
towards the purchase of upgraded, higher priced, non-sale priced
speakers for one year from date of original purchase.   Trade-in
speakers must be retruned undamaged with original packing and
owners manuals included.

JS 44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I (a) PLAINTIFFS

Sound Advice, Inc., a Florida Corporation

## DEFENDANTS

Monogram Credit Card Bank of Georgia, a Georgia banking corporation

00-6050

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF **Broward**
(EXCEPT IN U S PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Alan D. Lash, Esq.
Lash & Goldberg LLP
100 S.E. Second Street, Suite 1200
Miami, Florida 33131

ATTORNEYS (IF KNOWN)

Bruce J. Berman, Esq.
Weil Gotshal & Manges LLP
701 Brickell Avenue, Suite 2100
Miami, Florida 33131

## II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CAUSE OF ACTION (CITE THE U S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

28 USC 1441 and 1446. This is a notice of removal (based on diversity) of breach of contract action filed in Broward County Circuit Court.

## V. NATURE OF SUIT (PLACE AN x IN ONE BOX ONLY)

### CONTRACT
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☒ 190 Other Contract
☐ 195 Contract Product Liability

### REAL PROPERTY
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

### TORTS

**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

**PERSONAL INJURY**
☐ 362 Personal Injury— Med Malpractice
☐ 365 Personal Injury— Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 444 Welfare
☐ 440 Other Civil Rights

### PRISONER PETITIONS
☐ 510 Motions to Vacate Sentence Habeas Corpus
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Other

### FORFEITURE/PENALTY
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

### LABOR
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

### BANKRUPTCY
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

### SOCIAL SECURITY
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce/ICC Rates/etc
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions

## VI. ORIGIN (PLACE AN x IN ONE BOX ONLY)

☐ 1 Original Proceeding
☒ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

DEMAND $

Check YES only if demanded in complaint:
JURY DEMAND: ☒ YES ☐ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):
JUDGE _____ DOCKET NUMBER _____

DATE 1-11-00

SIGNATURE OF ATTORNEY OF RECORD

UNITED STATES DISTRICT COURT

$150.00   815309
01/11/00